No. 15-13100

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

———————————

FLO & EDDIE, INC.,

*Plaintiff-Appellant*,

v.

SIRIUS XM RADIO, INC.,

*Defendant-Appellee.*

———————————

**On Appeal from the United States District Court
for the Southern District of Florida
Case No. 1:13-cv-23182-DPG**

**BRIEF OF AMICUS CURIAE
RECORDING INDUSTRY ASSOCIATION OF AMERICA, INC.
IN SUPPORT OF PLAINTIFF-APPELLANT FLO & EDDIE, INC. AND REVERSAL**

George M. Borkowski
RECORDING INDUSTRY
ASSOCIATION OF AMERICA, INC.
1025 F Street NW, Tenth Floor
Washington, DC  20004
Telephone:  202-775-0101
Fax:  202-775-7523

Kenneth L. Doroshow
Devi M. Rao
JENNER & BLOCK LLP
1099 New York Avenue NW
Washington, DC  20001
Telephone:  202-639-6000
Fax:  202-639-6066

*Counsel for Amicus Curiae Recording
Industry Association of America, Inc.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1-1, 28-1(b), and 29-2, *amicus curiae* the Recording Industry Association of America, Inc. (RIAA) hereby certifies that RIAA has no parent corporation, and no publicly held company holds more than 10% of its stock.

RIAA hereby discloses each of the trial judge(s), and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case or appeal:

1.  Gayles, Darrin P.
    Judge, Southern District of Florida

2.  Barnett, Eleanor
    Counsel for Plaintiff-Appellant

3.  Borkowski, George M.
    Counsel for *Amicus Curiae* RIAA

4.  Breuder, Drew
    Counsel for Defendant-Appellee

5.  Doroshow, Kenneth L.
    Counsel for *Amicus Curiae* RIAA

6.  Flo & Eddie, Inc.
    Plaintiff-Appellant

7.  Geller, Harvey
    Counsel for Plaintiff-Appellant

8.  Gordon, Jason
    Counsel for Plaintiff-Appellant

9. Gradstein & Marzano, P.C.
   Counsel for Plaintiff-Appellant

10. Gradstein, Henry
    Counsel for Plaintiff-Appellant

11. Heller Waldman, P.L.
    Counsel for Plaintiff-Appellant

12. Jenner & Block LLP
    Counsel for *Amicus Curiae* RIAA

13. Marroso, David
    Counsel for Defendant-Appellee

14. Marzano, Maryann
    Counsel for Plaintiff-Appellant

15. Massey, David
    Counsel for Defendant-Appellee

16. Mayor, Evan
    Counsel for Defendant-Appellee

17. O'Melveny & Myers
    Counsel for Defendant-Appellee

18. Petrocelli, Daniel
    Counsel for Defendant-Appellee

19. Rao, Devi M.
    Counsel for *Amicus Curiae* RIAA

20. Recording Industry Association of America, Inc.
    *Amicus Curiae*

21. Seto, Cassandra
    Counsel for Defendant-Appellee

22. Sirius XM Radio, Inc.
    Defendant-Appellee

23. Steinberg, Martin
    Counsel for Defendant-Appellee

24. Waldman, Glenn
    Counsel for Plaintiff-Appellant

Dated: September 8, 2015           */s/* Kenneth L. Doroshow
                                   Kenneth L. Doroshow

                                   *Counsel for Amicus Curiae*
                                   *Recording Industry Association of*
                                   *America, Inc.*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF AUTHORITIES ................................................................... ii

INTEREST OF AMICUS CURIAE ......................................................... 1

INTRODUCTION .................................................................................. 3

ARGUMENT ......................................................................................... 4

I.      FLORIDA HAS A STRONG INTEREST IN PROTECTING ITS VIBRANT AND ECONOMICALLY IMPORTANT MUSIC INDUSTRY. ................................................................................. 4

II.     DIGITAL STREAMING OF SOUND RECORDINGS IS THE FUTURE OF THE MUSIC INDUSTRY ........................................ 7

III.    THE DISTRICT COURT'S REFUSAL TO RECOGNIZE A PUBLIC PERFORMANCE RIGHT IN PRE-1972 SOUND RECORDINGS THREATENS TO UNDERMINE THE ECONOMIC VIABILITY OF AN ENTIRE ERA OF IMPORTANT CREATIVE WORKS. ............... 9

        A.      Pre-1972 Sound Recordings Continue To Maintain Great Cultural and Historical Significance. .................................... 9

        B.      Pre-1972 Sound Recordings Continue To Have Significant Economic Value For Their Owners, Recording Artists, And Their Families .................................................................. 11

CONCLUSION .................................................................................... 16

CERTIFICATE OF COMPLIANCE ..................................................... 17

i

# TABLE OF AUTHORITIES

## CASES

*Florida Trailer & Equipment Co. v. Deal*, 284 F.2d 567 (5th Cir. 1960) ........................................................................................ 6, 9

*Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098 (Fla. 2008) ...................................... 7

*SP Healthcare Holdings, LLC v. Surgery Center Holdings, LLC*, 110 So. 3d 87 (Fla. 2d DCA 2013) ............................................................ 6

*State v. Egan*, 287 So. 2d 1 (Fla. 1973) .................................................. 7

## OTHER AUTHORITIES

Keith Caulfield, *"Guardians of the Galaxy" Soundtrack Hits No. 1 On Billboard 200*, Billboard.com, Aug. 13, 2014, http://www.billboard.com/articles/columns/chart-beat/6214496/guardians-of-the-galaxy-soundtrack-no-1-billboard-200 ...................................................................................... 14

*Dream Songs: The Music of the March on Washington*, New Yorker, Aug. 28, 2013, http://www.newyorker.com/culture/culture-desk/dream-songs-the-music-of-the-march-on-washington ............................ 10

Florida Dep't of State, *Florida Artists Hall of Fame*, http://dos.myflorida.com/cultural/programs/florida-artists-hall-of-fame/ (last visited Sept. 8, 2015) ...................................................... 6

Joshua P. Friedlander, *News and Notes on 2014 RIAA Music Industry Shipment and Revenue Statistics*, http://riaa.com/media/D1F4E3E8-D3E0-FCEE-BB55-FD8B35BC8785.pdf ....................................................................... 8

GrammyPro, Florida https://www.grammypro.com/chapters/florida/about (last visited Sept. 8, 2015) ....................................................................... 5

http://www.boxofficemojo.com/movies/?id=marvel2014a.htm (last visited Sept. 8, 2015) ....................................................................... 14

Andrew Grant Jackson, *1965: The Most Revolutionary Year in Music* (2015) .......................................................................................................... 11

Victor Luckerson, *Spotify and YouTube Are Just Killing Digital Music Sales*, Time, Jan. 3, 2014, http://business.time.com/2014/01/03/spotify-and-youtube-are-just-killing-digital-music-sales/ ................................................................................. 8

Jillian Mapes, *20 Old Songs Wes Anderson Gave New Life: A Playlist*, Flavorwire.com (Mar. 7, 2014, 1:00 PM), *available at* http://flavorwire.com/443888/20-old-songs-wes-anderson-gave-new-life-a-playlist ............................................................................................. 13

Scott Mervis, *Rolling Stones Staple "Satisfaction" Celebrates 50 Years*, Pittsburgh Post Gazette, June 18, 2015, http://www.post-gazette.com/ae/music/2015/06/18/The-Rolling-Stones-song-Satisfaction-at-50/stories/201506180015 ........................................................ 10

The Official Ed Sullivan Site, All Artists, http://www.edsullivan.com/all-artists/ (last visited Sept. 6, 2015) ................... 10

Amy Plitt, *25 Best "Mad Men" Musical Moments*, Rolling Stone, May 15, 2015, http://www.rollingstone.com/tv/lists/25-best-mad-men-musical-moments-20150515 .................................................................... 13

RIAA, Economic Impact of the Music Community in the United States (2009), http://riaa.com/media/F53126EF-A04B-EEC4-BA3D-398C68909018.pdf................................................................................. 15

Ben Sisario, *Universal Music Posts Strong Results, and Streaming Is a Bright Spot*, N.Y. Times, Sept. 2, 2015, http://www.nytimes.com/2015/09/03/business/media/universal-music-posts-strong-results-and-streaming-is-a-bright-spot.html?smid=tw-ytmedia&smtyp=cur&_r=0 ................................................. 7

Wikipedia, List of Songs in Rock Band, https://en.wikipedia.org/wiki/List_of_songs_in_Rock_Band (last visited Sept. 8, 2015) ................................................................................. 13-14

## INTEREST OF AMICUS CURIAE

*Amicus curiae* Recording Industry Association of America, Inc. ("RIAA") respectfully submits this brief in support of Plaintiff-Appellant Flo & Eddie, Inc.[1]

The RIAA is the trade organization that supports and promotes the creative and financial vitality of the major recorded music companies. Its members are the music labels that comprise the most vibrant record industry in the world. RIAA members create, manufacture, and/or distribute 85% of all legitimate recorded music produced and sold in the United States. RIAA members depend on copyrights and state laws that safeguard property to protect the valuable performances embodied in sound recordings in which they have invested and which they have created in collaboration with recording artists and other creators.

Florida has the fourth-largest music industry in the country, by state. In Florida, over 8,000 people work in the industry as local performers, musicians, managers, and at music labels. Florida's music industry also supports over 2,600 local businesses. *See* RIAA, Economic Impact of the Music Community in the United States (2009), http://riaa.com/media/F53126EF-A04B-EEC4-BA3D-398C68909018.pdf. Numerous music labels are incorporated or do business in Florida. Florida is also home to many musical artists, including those who created

---

[1] No party's counsel has authored this brief in whole or in part. No one other than *amicus* and its members contributed money that was intended to fund preparing or submitting this brief.

iconic sound recordings before February 15, 1972 (pre-1972 sound recordings) as well as artists who bring new and exciting music to the world today. *Amicus* and its members therefore have a significant interest in the important question this case presents concerning the protection of performances embodied in pre-1972 sound recordings under Florida law.

RIAA submits this *amicus curiae* brief, accompanied by a motion for leave to file the same, pursuant to Federal Rule of Appellate Procedure 29(a) and Circuit Rule 29-1.

## INTRODUCTION

This case began from the undisputed premise that Florida law protects the rights of owners of pre-1972 sound recordings.  *See, e.g.*, *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-cv-23182, 2015 WL 3852692, at *4 (S.D. Fla. June 22, 2015) ("Sirius does not dispute that Flo & Eddie has some property interest in the sound recordings.").  However, without any further discussion of Florida law, and despite the broad property rights provided by state law, the district court declared that these property rights – which neither the courts nor the legislature of Florida have ever before so restricted – do not exist with respect to unauthorized and uncompensated digital public performances of pre-1972 sound recordings.

The district court's decision was clearly wrong.  In addition to the many legal errors that Appellant has identified in its opening brief (*see* Appellant's Brief), the district court marginalized Florida's strong interest in the economic vitality of its music industry, and also trivialized the irreplaceable cultural and economic importance of pre-1972 sound recordings.  By sharply departing from the broad protections that Florida law affords to all forms of property (including intangible property), the district court brought about an indefensible injustice on the owners of pre-1972 sound recordings who have invested – and regularly continue to invest – millions of dollars to develop and protect those recordings in order to introduce them to new generations of music fans.  The district court's

ruling has also delivered a devastating blow to recording artists and their families who depend on compensation from the use of sound recordings for their livelihoods – or simply to make ends meet. The district court's decision is both bad law and bad policy and should be reversed.

## ARGUMENT

### I.  FLORIDA HAS A STRONG INTEREST IN PROTECTING ITS VIBRANT AND ECONOMICALLY IMPORTANT MUSIC INDUSTRY.

The district court acknowledged that courts in California and New York have recently confirmed state law protection of the exclusive rights of public performance and reproduction of pre-1972 sound recordings. *See* 2015 WL 3852692, at *4. With little reasoning, however, the district court determined that Florida law does not recognize a public performance right because California and New York law is more developed on the issue, assuming, as a matter of "common knowledge," that those jurisdictions are "the creative centers of the Nation's art world." *Id.* "Florida," the court summarily concluded, "is different." *Id*. The district court was demonstrably wrong.

Although the district court erroneously assumed it away, the vitality and importance of Florida's music industry cannot be overstated. Florida has the fourth-largest music industry in the country, by state. Over 8,000 Floridians work in the industry as local performers, musicians, managers, and at music labels.

4

Florida's music industry also supports over 2,600 local businesses. *See* RIAA, Economic Impact of the Music Community in the United States (2009), http://riaa.com/media/F53126EF-A04B-EEC4-BA3D-398C68909018.pdf.

Hundreds of music labels are either headquartered in Florida or have substantial offices there, including Universal Music Latin Entertainment, Sony Music Latin and Warner Music Latina. The Recording Academy, the organization responsible for (among other things) the Grammy Awards, observes that Florida has "one of the most diverse, talented, and fastest-growing music communities in the country." Grammy Pro, Florida, https://www.grammypro.com/chapters/florida/about (last visited Sept. 8, 2015).

Florida is also home to many of the best-known recording artists of the pre-1972 era. For example, Bobby Goldsboro, whose roster of chart-topping hits includes such pre-1972 classics as "Honey" and "See The Funny Little Clown," is a Florida native and resides there today. Other legendary pre-1972 recording artists that call Florida home include such diverse artists as country great Mel Tillis, Roger McGuinn (The Byrds), David Cassidy (The Partridge Family), Marty Balin (Jefferson Airplane), Don Brewer (Grand Funk Railroad), and Dion DiMucci, better known as "Dion," whose pre-1972 hits include the classics "Runaround Sue" and "The Wanderer." The Florida Artists Hall of Fame recognizes such iconic pre-1972 recording artists as Ray Charles, Bo Diddley, and

Johnny Tillotson.   *See* Fla. Dep't of State, *Florida Arists Hall of Fame*, http://dos.myflorida.com/cultural/programs/florida-artists-hall-of-fame/        (last visited Sept. 8, 2015).

That Florida may not have the same "bevy of case law interpreting common law copyright" as California or New York does not mean, as the district court appeared to assume, that Florida has any less of an interest in affording the broadest possible protections for common law copyrights and other rights in pre-1972 sound recordings.  2015 WL 3852692, at *4.  To the contrary, the district court should have regarded that "bevy of case law" on the subject of common law copyright as a resource on which to draw for guidance rather than as a sign of a divergence of approach to an issue of common law.  *See, e.g.*, *SP Healthcare Holdings, LLC v. Surgery Ctr. Holdings, LLC*, 110 So. 3d 87, 93 (Fla. 2d DCA 2013) (in the absence of "any Florida decisions directly on point[,]… [w]e rely on two out-of-state cases as persuasive authority"); *see also*, *e.g.*, *Fla. Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 572 (5th Cir. 1960) (a lack of precedent "hardly paralyzes a common law system whose nervous system is a 'judicial inventiveness' … to meet new situations" (internal quotation marks omitted)).

In Florida, as in California and New York (and all other states), "the great fundamental object and principle of the common law [i]s the protection of the individual in the enjoyment of all his inherent and essential rights and to afford

6

him a legal remedy for their invasion." *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1104 (Fla. 2008) (quoting *Cason v. Baskin*, 20 So. 2d 243 (Fla. 1944)).  By ignoring Florida's own substantial interests in providing such broad protection to those whose livelihoods depend on the robust protection of property rights in pre-1972 sound recordings, and by manufacturing a restriction on those rights that had never before existed under Florida's common law, the district court exceeded the scope of its authority and failed to interpret the common law in a manner consistent with its fundamental protective purpose.  *See State v. Egan*, 287 So. 2d 1, 6 (Fla. 1973) ("The court has no more right to abrogate the common law than it has to repeal the statutory law.").

## II.    DIGITAL STREAMING OF SOUND RECORDINGS IS THE FUTURE OF THE MUSIC INDUSTRY.

It is no secret that royalties from public performances via digital transmissions – whether streamed by satellite or over the Internet – are fast becoming the most significant source of revenues for the music industry.  The number of digital streams of recorded music has grown at an increasingly rapid pace as more consumers turn to digital streaming services as their primary source of musical content.  *See* Ben Sisario, *Universal Music Posts Strong Results, and Streaming Is a Bright Spot*, N.Y. Times, Sept. 2, 2015, http://www.nytimes.com/2015/09/03/business/media/universal-music-posts-strong-results-and-streaming-is-a-bright-spot.html?smid=tw-ytmedia&smtyp=cur&_r=0

7

(reporting that Universal Music Group's "34 percent jump in subscription and streaming services during the first half of the year … 'more than offset the decline in both digital download and physical sales'" (internal quotation marks omitted)); Victor Luckerson, *Spotify and YouTube Are Just Killing Digital Music Sales*, Time, Jan. 3, 2014, http://business.time.com/2014/01/03/spotify-and-youtube-are-just-killing-digital-music-sales/ ("The rise of streaming has been swift.").  In the short period between 2010 and 2014, the proportion of total United States music industry revenues from streaming grew from just 7 percent to 27 percent, amounting to roughly $2 billion annually.  *See* Joshua P. Friedlander, *News and Notes on 2014 RIAA Music Industry Shipment and Revenue Statistics*, http://riaa.com/media/D1F4E3E8-D3E0-FCEE-BB55-FD8B35BC8785.pdf.  Given the primacy of today's digital music environment, the exclusive right to license and be compensated for the digital public performance of music is more critical than ever to the vitality, and, indeed, the economic survival, of everyone involved in creating and distributing music – including Florida's vibrant music industry.

The district court's arbitrary refusal to recognize a public performance right for pre-1972 sound recordings threatens to eliminate a critically important source of revenue for the music business, including for many legendary recording artists and their families.  That this source of revenue is a modern development should have been no impediment to the district court's recognition of the public

performance right.  Indeed, the "nervous system" of the common law is "a 'judicial inventiveness' … to meet new situations." *Fla. Trailer & Equip. Co.*, 284 F.2d at 572 (citations omitted).  That is the case here.

## III.  THE DISTRICT COURT'S REFUSAL TO RECOGNIZE A PUBLIC PERFORMANCE RIGHT IN PRE-1972 SOUND RECORDINGS THREATENS TO UNDERMINE THE ECONOMIC VIABILITY OF AN ENTIRE ERA OF IMPORTANT CREATIVE WORKS.

### A.  Pre-1972 Sound Recordings Continue To Maintain Great Cultural and Historical Significance.

The late 1950s through the early 1970s was a culturally explosive time in this country like no time thereafter, and the music of that era was the soundtrack of those times.  The social and cultural issues that were at the fore in that era remain predominant today:  race, gender equality, politics, poverty, war, sex, and drugs. Music commented on, and in many ways led, the national discourse like no other media, and that music has withstood the test of time.  Marvin Gaye's "What's Going on" (1971), for example, was one of the era's most plaintive expressions of concern about police brutality.  Popular music included songs supporting civil rights (Sam Cooke's "A Change Is Gonna Come" (1964), and the Impressions' "People Get Ready" (1965), among others), opposing war (*e.g.*, Donovan's "Universal Soldier" (1964) and Barry McGuire's "Eve of Destruction" (1965)), and proclaiming the importance of women's liberation and equal rights (*e.g.*, Aretha Franklin's "Respect" (1967) and Nancy Sinatra's "These Boots Are Made

For Walking" (1966)).  Artists such as Mahalia Jackson, Marian Anderson, Joan Baez, and Bob Dylan, among others, performed at the 1963 March on Washington, singing songs that are embodied in well-known pre-1972 sound recordings.  *See Dream Songs: The Music of the March on Washington*, New Yorker, Aug. 28, 2013, http://www.newyorker.com/culture/culture-desk/dream-songs-the-music-of-the-march-on-washington.

The music of this era not only made music industry news; it made headline news.  The Beatles appeared on the cover of Newsweek, which also referred to the opening riff of The Rolling Stones' "(I Can't Get No) Satisfaction" (1965) as "the five notes that shook the world."  *See* Scott Mervis, *Rolling Stones Staple "Satisfaction" Celebrates 50 Years*, Pittsburgh Post Gazette, June 18, 2015, http://www.post-gazette.com/ae/music/2015/06/18/The-Rolling-Stones-song-Satisfaction-at-50/stories/201506180015.

This now iconic music permeated popular culture.  Countless artists appeared on The Ed Sullivan Show to perform their chart-topping hits, from Elvis Presley to the Beatles to Ella Fitzgerald, the Four Tops, Gladys Knight and the Pips, the Mamas & Papas, the Rascals, the Righteous Brothers, Jefferson Airplane, Simon & Garfunkel, and many others.  *See* The Official Ed Sullivan Site, All Artists, http://www.edsullivan.com/all-artists/ (last visited Sept. 6, 2015).  The

music of this period was diverse and innovative, and lives on in popular music today:

> Funk evolved from soul and into the main black genre of the 1970s; then birthed disco and coexisted with it before being absorbed by hip-hop.  The funk/disco beat was the first modern beat, the earliest one that kids today can relate to and dance to, the main strand of hip-hop's DNA.  In the early 1980s, samplers were invented, and … James Brown was the most sampled artist, his tracks becoming the foundations of countless rap tunes …. [I]t made him an icon … , the godfather of soul, funk, and hip-hop.

Andrew Grant Jackson, *1965: The Most Revolutionary Year in Music* 150 (2015).

###### B. Pre-1972 Sound Recordings Continue To Have Significant Economic Value For Their Owners, Recording Artists, And Their Families.

Although they were created decades ago, pre-1972 sound recordings remain financially important to the owners of those recordings, the artists who created and performed on them, and their families.  RIAA members have entire "catalog" divisions, of which pre-1972 sound recordings are a major element.

RIAA members routinely invest substantial sums to acquire, promote and market pre-1972 sound recordings.  RIAA members' catalog divisions have hundreds of employees engaged in a full range of music label activities, including reissuing older albums, remastering recordings, and producing box sets and special occasion releases.  These pre-1972 sound recordings are regularly covered (*i.e.*, performed or recorded by other musical acts), sampled, and used in other ways.  The RIAA's members also license these recordings for movies, television,

11

commercials, video games, and third-party compilations.  The result is that pre-1972 sound recordings are continuously used and continue to generate significant revenue.

RIAA members continue to invest in acquiring, promoting and marketing pre-1972 sound recordings because those works remain commercially popular. These pre-1972 recordings are not flashes in the pan—they are "evergreen" and have proven their value by standing the test of time.  A large percentage of best-selling recordings sold today are compilations or reissues of pre-1972 sound recordings that still have great appeal to average music fans and connoisseurs alike, such as "Elvis 2nd To None," "The Very Best of Frank Sinatra," and "The Very Best of the Rolling Stones, 1964-1971."

But it is not just music fans that contribute to the popularity of pre-1972 sound recordings; the music and recording artists of the era have been kept alive in the public's consciousness through other media.  Critically acclaimed and award winning "biopics" of musicians, such as *Ray* (Florida native Ray Charles), *Walk the Line* (Johnny Cash), *Dreamgirls* (a fictionalized version of Diana Ross and the Supremes), as well as more recent films like *Get on Up* (James Brown) and *Love & Mercy* (Brian Wilson and The Beach Boys), introduce new generations of audiences to these pre-1972 artists.  In television, pre-1972 sound recordings are used frequently to evoke an era and help tell a story.  The music in the hit

12

television series *Mad Men*, for example, documents the tumultuous 1960s through its "musical moments, covering everything from Chubby Checker to David Bowie." Amy Plitt, *25 Best "Mad Men" Musical Moments*, Rolling Stone, May 15, 2015, http://www.rollingstone.com/tv/lists/25-best-mad-men-musical-moments-20150515.

New generations of audiences are introduced to pre-1972 recordings through their inclusion in movie or television soundtracks, or through other forms of popular media, such as video games. For example, director Wes Anderson's popular film soundtracks "often highlight[] gems from the '60s and '70s." Jillian Mapes, *20 Old Songs Wes Anderson Gave New Life: A Playlist*, Flavorwire.com (Mar. 7, 2014), http://flavorwire.com/443888/20-old-songs-wes-anderson-gave-new-life-a-playlist. Sound recordings such as Nico's "These Days" (1967), David Bowie's "Life on Mars" (1971), and The Who's "A Quick One While He's Away" (1966), "were all hits to a certain generation of listeners, but through Anderson's films they became cultural touch-points for millennials as well." *Id.* The popular *Rock Band* series of video games exposed a generation of young "gamers" to such pre-1972 classics as Creedence Clearwater Revival's "Fortunate Son," The Who's "Baba O'Riley," and The Jimi Hendrix Experience's "Purple Haze." *See* Wikipedia, List of Songs in Rock Band,

13

https://en.wikipedia.org/wiki/List_of_songs_in_Rock_Band (last visited Sept. 8, 2015).

Indeed, just last year, the soundtrack for the superheroes-in-space film *Guardians of the Galaxy* topped the Billboard Top 200 charts, and was the first No. 1 soundtrack in which the entire album was comprised of previously released sound recordings. *See* Keith Caulfield, *"Guardians of the Galaxy" Soundtrack Hits No. 1 On Billboard 200*, Billboard.com, Aug. 13, 2014, http://www.billboard.com/articles/columns/chart-beat/6214496/guardians-of-the-galaxy-soundtrack-no-1-billboard-200.[2]    All of the sound recordings were originally released in the late 1960s and 1970s and contained such pre-1972 hits as Norman Greenbaum's "Spirit in the Sky" (1969), The Five Stairsteps' "O-O-H Child" (1970), The Jackson's 5's "I Want You Back" (1969), and Marvin Gaye & Tammi Terrell's "Ain't No Mountain High Enough" (1967).

In short, the universe of pre-1972 sound recordings is vast and contains many of the most popular and valuable recordings ever created – recordings that remain as relevant and sought after today as ever.  The district court's opinion, if upheld, threatens to undermine the value of this treasure trove of popular music history.  And to refuse to recognize a public performance right with respect to

---

[2] *Guardians of the Galaxy* was a blockbuster movie, with a worldwide box office of nearly $775 million.  http://www.boxofficemojo.com/movies/?id=marvel2014a.htm.

these works, while post-1972 sound recordings enjoy such protection under federal law, makes no sense.  In practical terms, it defies logic that any music service should have to pay, for example, for the right to transmit a recently popular "song of the Summer" recording, but not for the right to transmit the iconic recordings of the Beatles or, for that matter, that a music service should have to pay for the Rolling Stones' "Start Me Up" (1981) but not their "(I Can't Get No) Satisfaction" (1965).  Neither would it make sense to require payment for the digital transmission of the Four Tops' 1973 hit, "Ain't No Woman (Like the One I Got)," but not for the transmission of the same group's earlier 1960s hits like "Baby I Need Your Loving," "Sugar Pie Honey Bunch," or "Reach Out."  Not only fundamental fairness, but also common sense, compels the recognition of a public performance right for pre-1972 sound recordings under Florida law.

15

## CONCLUSION

Pre-1972 sound recordings are timeless and valuable.  The owners of those recordings, the artists who created and performed on them, and those artists' families, deserve to be compensated when those recordings are used by others for profit.  Florida law recognizes those property rights.  Unfortunately, one district court did not.  Because that was clear error, this Court should reverse the district court's opinion.

Respectfully submitted,

Dated: September 8, 2015

/s/ Kenneth L. Doroshow

George M. Borkowski
RECORDING INDUSTRY
ASSOCIATION OF AMERICA, INC.
1025 F Street NW, Tenth Floor
Washington, DC  20004
Telephone:  202-775-0101
Fax:  202-775-7523

Kenneth L. Doroshow
Devi M. Rao
JENNER & BLOCK LLP
1099 New York Avenue NW
Washington, DC  20001
Telephone:  202-639-6000
Fax:  202-639-6066

*Counsel for Amicus Curiae*
*Recording Industry Association of*
*America, Inc.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(5) and Circuit Rule 29-2(c)(2), I certify

that the foregoing brief is proportionately spaced, has a typeface of 14 points or

more, and contains 3,173 words, exclusive of those parts exempted by Fed. R.

App. P. 32(a)(7)(B)(iii).


September 8, 2015            */s/* Kenneth L. Doroshow

                                         Kenneth L. Doroshow
*Attorney for the Recording Industry
Association of America*

17

## CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/* Kenneth L. Doroshow
Kenneth L. Doroshow

*Counsel for Amicus Curiae
Recording Industry Association of
America, Inc*

18