APPEAL No. 15-13100-AA

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

Flo & Eddie, Inc., a California corporation, individually and on behalf of all others similarly situated,

*Plaintiff-Appellant,*

v.

Sirius XM Radio Inc., a Delaware corporation,

*Defendant-Appellee*,

DOES 1 through 10,

*Defendants.*

_____

On Appeal from the United States District Court
for the Southern District of Florida

_____

## BRIEF OF DEFENDANT-APPELLEE SIRIUS XM RADIO INC.

_____

Jonathan D. Hacker
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
Telephone: (202) 383-5300

Daniel M. Petrocelli
Cassandra L. Seto
Evan T. Mayor
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035
Telephone: (310) 553-6700

*Attorneys for Defendant-Appellee Sirius XM Radio Inc.*

Appeal No. 15-13100-AA
*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*

## <u>CERTIFICATE OF INTERESTED PERSONS AND</u>
## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 and 26.1-3, defendant-appellee Sirius XM Radio Inc. hereby certifies that set forth below is a list of the trial judge(s), attorneys, persons, associations of persons, firms, partnerships or corporations that have an interest in the outcome of the above-captioned appeal, including any publicly held corporation owning 10% or more of the party's stock, and other identifiable legal entities related to a party:

Cohen, Evan

Gayles, Darrin P.

Barnett, Eleanor

Breuder, Drew

Flo & Eddie, Inc.

Geller, Harvey

Gordon, Jason

Gradstein & Marzano, P.C.

Gradstein, Henry

Hacker, Jonathan

Heller Waldman, P.L.

Kaylan, Howard

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*

Liberty Media Corporation (NASDAQ:  LMCA, LMCB, LMCK)

Marroso, David

Marzano, Maryann

Massey, David

Mayor, Evan

O'Melveny & Myers LLP

Petrocelli, Daniel

Seto, Cassandra

Sirius XM Holdings Inc. (NASDAQ: SIRI)

Sirius XM Radio Inc.

Turnoff, William

Volman, Mark

Waldman, Glenn

Appeal No. 15-13100-AA
*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*


Dated:          October 5, 2015          O'MELVENY & MYERS LLP

                                         By: /s/ Daniel M. Petrocelli

                                             Daniel M. Petrocelli
                                             Cassandra L. Seto
                                             Evan T. Mayor
                                             1999 Avenue of the Stars, 7th Floor
                                             Los Angeles, CA 90067-6035
                                             Telephone: (310) 553-6700

                                             Jonathan D. Hacker
                                             1625 Eye Street, N.W.
                                             Washington, D.C. 20006
                                             Telephone: (202) 383-5300

                                             *Attorneys for Defendant-Appellee Sirius XM*
                                             *Radio Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

The issue in this case is whether, as a matter of Florida law, the owner of a pre-1972 sound recording has an unfettered, unconditional right to control all performances of that recording by those who lawfully purchase or obtain it.  The district court correctly held that no such right exists.  This Court's disposition of Flo & Eddie, Inc.'s appeal of that decision is important not only to the parties to this appeal, but to the thousands of AM/FM radio stations, restaurants, bars, retail stores, and individuals in Florida that play records made before 1972.  While Sirius XM Radio Inc. believes that this Court can affirm the district court's decision on the papers, given the importance of this appeal and the issues involved, Sirius XM believes that oral argument may assist the Court.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................1

STATEMENT OF ISSUES ....................................................................4

STATEMENT OF RELEVANT FACTS ...............................................5

SUMMARY OF ARGUMENT ..............................................................7

ARGUMENT ..........................................................................................9

I.     THE DISTRICT COURT RIGHTLY HELD THAT FLORIDA
LAW DOES NOT GIVE OWNERS OF PRE-1972
RECORDINGS AN UNFETTERED RIGHT TO CONTROL
ALL PERFORMANCES. ................................................................9

     A.    Plaintiff Seeks To Reverse A Decades-Long Consensus
That State Law Does Not Provide A Performance Right. .........9

     B.    Florida Law Governing Real And Personal Property
Does Not Provide A Performance Right..................................18

     C.    Florida Common Law Copyright Only Provides A
Limited Anti-Copying Right, And Does Not Provide A
Performance Right. .................................................................21

     D.    Florida Statutory Law Does Not Provide A Performance
Right.........................................................................................27

     E.    Creating A Common Law Performance Right Is A Matter
Of Legislative Policymaking. ..................................................30

II.    THE JUDGMENT BELOW CAN BE AFFIRMED ON THE
ALTERNATIVE GROUND THAT APPLYING A COMMON
LAW PERFORMANCE RIGHT TO SIRIUS XM WOULD
VIOLATE THE COMMERCE CLAUSE. ........................................35

# TABLE OF CONTENTS
### (continued)

**Page**

    A.    The Federal Copyright Act Does Not Authorize Florida To Burden Interstate Commerce. ..............................................35

    B.    Applying A Florida Performance Right To Sirius XM's National Broadcasts Would Violate The Commerce Clause. .......................................................................................37

III.    THE DISTRICT COURT RIGHTLY HELD THAT PLAINTIFF'S UNFAIR COMPETITION, CONVERSION, AND CIVIL THEFT CLAIMS ARE MERITLESS. .........................42

    A.    The Non-Copyright Doctrines Plaintiff Invokes Do Not Provide Greater Protection Than Copyright. ...........................42

    B.    Plaintiff's Unfair Competition Claim Is Meritless. .................44

    C.    Plaintiff's Conversion Claim Is Meritless. ..............................48

    D.    Plaintiff's Civil Theft Claim Is Meritless. ...............................51

IV.    THE DISTRICT COURT RIGHTLY HELD THAT INTERNAL, PARTIAL REPRODUCTIONS MADE TO FACILITATE SIRIUS XM'S PERFORMANCES ARE LAWFUL. .......................................................................................52

CONCLUSION ....................................................................................56

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACLU v. Johnson*,

194 F.3d 1149 (10th Cir. 1999) ..........................................................41

*Allison v. Vintage Sports Plaques*,

136 F.3d 1443 (11th Cir. 1998) .........................................................20

*Almeida v. Amazon.com, Inc.*,

456 F.3d 1316 (11th Cir. 2006) .........................................................51

*AlphaMed Pharms. Corp. v. Arriva Pharms., Inc.*,

432 F. Supp. 2d 1319 (S.D. Fla. 2006) ..............................................47

*\* Am. Booksellers Found. v. Dean*,

342 F.3d 96 (2d Cir. 2003) ................................................................38

*Am. Honda Motor Co. v. Votour*,

435 So. 2d 368 (Fla. Dist. Ct. App. 1983) .........................................22

*Am. Libraries Ass'n v. Pataki*,

969 F. Supp. 160 (S.D.N.Y. 1997) ....................................................41

*Arista Records LLC v. Lime Grp. LLC*,

784 F. Supp. 2d 398 (S.D.N.Y. 2011) ...............................................46

*Authors Guild, Inc. v. HathiTrust*,

755 F.3d 87 (2d Cir. 2014) ................................................................53

## TABLE OF AUTHORITIES
(continued)

Page

*Balcor Prop. Mgmt., Inc. v. Ahronovitz*,

    634 So. 2d 277 (Fla. Dist. Ct. App. 1994) ........................................................ 30

*Barr v. State*,

    507 So. 2d 175 (Fla. Dist. Ct. App. 1987) ........................................................ 31

*Bd. of Trustees of the Internal Improvement Trust Fund v.*

    *Key West Conch Harbor,*

    683 So. 2d 144 (Fla. Dist. Ct. App. 1996) ........................................................ 28

*BMW of N. Am., Inc. v. Gore*,

    517 U.S. 559, 116 S. Ct. 1589 (1996) ............................................................... 36

*Bonneville Int'l Corp. v. Peters*,

    347 F.3d 485 (3d Cir. 2003) .............................................................................. 16

*Brandon Films, Inc. v. Arjay Enters., Inc.*,

    230 N.Y.S.2d 56 (Sup. Ct. 1962) ...................................................................... 25

*Capitol Records v. Erickson*,

    2 Cal. App. 3d 526 (1969) ................................................................................. 24

*Capitol Records, Inc. v. Mercury Records Corp.*,

    221 F.2d 657 (2d Cir. 1955) .............................................................................. 12

*Capitol Records, Inc. v. Naxos of Am., Inc.*,

    4 N.Y.3d 540 (2005) ................................................................................. *passim*

# TABLE OF AUTHORITIES
(continued)

**Page**

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,

    536 F.3d 121 (2d Cir. 2008) ...............................................................53

\* *CBS, Inc. v. Garrod*,

    622 F. Supp. 532 (M.D. Fla. 1985)............................................ *passim*

*City of Cars, Inc. v. Simms*,

    526 So. 2d 119 (Fla. Dist. Ct. App. 1988) .........................................51

*City of Miami v. Metro. Dade Cty.*,

    407 So. 2d 243 (Fla. Dist. Ct. App. 1981) .........................................28

*Costa Del Sol Ass'n, Inc. v. State Dep't of Bus. & Prof'l Reg.*,

    987 So. 2d 734 (Fla. Dist. Ct. App. 2008) .........................................19

*Dastar Corp. v. Twentieth Century Fox Film Corp.*,

    539 U.S. 23, 123 S. Ct. 2041 (2003)..................................................43

*Dep't of Ins. v. Dade Cty. Cons. Advocate's Office*,

    492 So. 2d 1032 (Fla. 1986) ...............................................................19

*Dep't of Law Enf't v. Real Prop.*,

    588 So. 2d 957 (Fla. 1991) .................................................................19

*Dickman v. Comm'r*,

    465 U.S. 330, 104 S. Ct. 1086 (1984).................................................19

## TABLE OF AUTHORITIES
(continued)

**Page**

*Dowling v. U.S.*,

    473 U.S. 207, 105 S. Ct. 3127 (1985)..........................................19, 21

*Ediciones Musicales y Representaciones Internacionales, S.A. v.*

    *San Martin*,

    582 F. Supp. 2d 1358 (S.D. Fla. 2008)..............................................46

*EMI Records Ltd. v. Premise Media Corp. L.P.*,

    2008 WL 5027245 (N.Y. Sup. Ct. Aug. 8, 2008).......................22, 54

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*,

    2014 WL 4725382 (C.D. Cal. Sept. 22, 2014) ...................................6

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*,

    62 F. Supp. 3d 325 (S.D.N.Y. 2014) ........................................ *passim*

*Flo & Eddie, Inc. v. Sirius XM Radio Inc.*,

    2015 WL 585641 (S.D.N.Y. Feb. 10, 2015) .................................6, 26

*Flood v. Kuhn*,

    407 U.S. 258, 92 S. Ct. 2099 (1972)..................................................38

*French v. Maguire*,

    1878 WL 11310 (N.Y. Sup. Ct. 1878)................................................25

*Gersh v. Cofman*,

    769 So. 2d 407 (Fla. Dist. Ct. App. 2000).........................................51

## TABLE OF AUTHORITIES
(continued)

Page

*Glades Pharm., LLC. v. Murphy*,

    2005 WL 3455857 (N.D. Ga. Dec. 16, 2005) ..................................................49

*Golan v. Holder*,

    132 S. Ct. 873 (2012)...........................................................................................54

*Goldstein v. California*,

    412 U.S. 546, 93 S. Ct. 2303 (1973)....................................................................53

*Graham v. Estuary Props., Inc.*,

    399 So. 2d 1374 (Fla. 1981) ................................................................................18

*Halstead v. Grinnan*,

    152 U.S. 412, 14 S. Ct. 641 (1894)......................................................................17

*Harper & Row Publishers, Inc. v. Nation Enters.*,

    471 U.S. 539, 105 S. Ct. 2218 (1985)............................................................54, 55

*Healy v. Beer Inst., Inc.*,

    491 U.S. 324, 109 S. Ct. 249 (1989)....................................................................38

* *Horne v. Vic Potamkin Chevrolet, Inc.*,

    533 So. 2d 261 (1988)...............................................................................2, 8, 31

*Int'l News Serv. v. Assoc. Press*,

    248 U.S. 215, 39 S. Ct. 68 (1918)........................................................................48

# TABLE OF AUTHORITIES
(continued)

**Page**

*Intelsat Corp. v. Multivision TV LLC*,

    2010 WL 5437261 (S.D. Fla. Dec. 27, 2010)..............................................49, 50

*Island Silver & Spice, Inc. v. Islamorada*,

    542 F.3d 844 (11th Cir. 2008) ...........................................................38

*Joe Hand Promotions v. Hart*,

    2012 WL 1289731 (S.D. Fla. Apr. 16, 2012)....................................................50

*Kramer v. Thomas*,

    2006 WL 4729242 (C.D. Cal. Sept. 28, 2006) ...........................................23, 54

*Krischer v. McIver*,

    697 So. 2d 97 (Fla. 1997) .................................................................31

*Liquor Store v. Cont'l Distilling Corp.*,

    40 So. 2d 371 (Fla. 1949) ................................................................19

*Lone Ranger TV, Inc., v. Program Radio Corp.*,

    740 F.2d 718 (9th Cir. 1984) ............................................................43

*M.G.B. Homes, Inc. v. Ameron Homes, Inc.*,

    903 F.2d 1486 (11th Cir. 1990) ....................................................42, 44

*Magical Mile, Inc. v. Benowitz*,

    510 F. Supp. 2d 1085 (S.D. Fla. 2007)...............................................44

# TABLE OF AUTHORITIES
(continued)

Page

*MAI Sys. Corp. v. Peak Computer, Inc.*,

    991 F.2d 511 (9th Cir. 1993) ............................................................53

*Moore v. State*,

    473 So. 2d 686 (Fla. Dist. Ct. App. 1984)......................................22

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,

    117 F. Supp. 2d 1322 (M.D. Fla. 2000)..........................................48

* *NCAA v. Miller*,

    10 F.3d 633 (9th Cir. 1993) .......................................................37, 38

*New Eng. Power Co. v. New Hampshire*,

    455 U.S. 331, 102 S. Ct. 1096 (1982)..............................................36

*Pandora Media, Inc. v. Flo & Eddie, Inc.*,

    Appeal No. 15-55287 (9th Cir.).........................................................6

*Parker v. Brown*,

    317 U.S. 341, 63 S. Ct. 307 (1943)..................................................40

*Patterson v. Century Prods.*,

    93 F.2d 489 (2d Cir. 1937) ...............................................................25

* *Pike v. Bruce Church, Inc.*,

    397 U.S. 137, 90 S. Ct. 844 (1970)......................................39, 40, 41

# TABLE OF AUTHORITIES
(continued)

**Page**

*Playboy Enters., Inc. v. Webbworld, Inc.*,

    991 F. Supp. 543 (N.D. Tex. 1997) ..................................................................47

*Practice Mgmt. Assocs., Inc. v. Old Dominion Ins. Co.*,

    601 So. 2d 587 (Fla. Dist. Ct. App. 1992) ........................................................45

*R.C. v. State*,

    481 So. 2d 14 (Fla. Dist. Ct. App. 1985) ...........................................................30

*R.J.L. v. State,*

    887 So. 2d 1268 (Fla. 2004) ..............................................................................22

\* *RCA Mfg. Co. v. Whiteman*,

    114 F.2d 86 (2d Cir. 1940) ....................................................................... *passim*

*S.-Cent. Timber Dev., Inc. v. Wunnicke*,

    467 U.S. 82, 104 S. Ct. 2237 (1984) ..................................................................36

*Santilli v. Cardone*,

    2008 WL 2790242 (M.D. Fla. July 18, 2008) ...................................................49

\* *Shands Teaching Hosp. & Clinics v. Smith*,

    497 So. 2d 644 (Fla. 1986) .......................................................................1, 8, 31

*Siplin v. State*,

    972 So. 2d 982 (Fla. Dist. Ct. App. 2007) .........................................................52

## TABLE OF AUTHORITIES
(continued)

Page

*Sirius XM Radio Inc. v. Flo & Eddie, Inc.*,

    Appeal No. 15-1164 (2d Cir.)................................................................34

*Small Bus. Admin. v. Echevarria*,

    864 F. Supp. 1254 (S.D. Fla. 1994)..............................................48, 51

*Smith v. Psychiatric Solutions, Inc.*,

    750 F.3d 1253 (11th Cir. 2014) ........................................................27

*SmokEnders, Inc. v. Smoke No More, Inc.*,

    1974 WL 20234 (S.D. Fla. Oct. 21, 1974) ........................................23

* *Sony Corp. of Am. v. Universal City Studios, Inc.*,

    464 U.S. 417, 104 S. Ct. 774 (1984)......................................3, 21, 32

*Spencer v. City of W. Palm Beach*,

    2015 WL 4651089 (S.D. Fla. Aug. 5, 2015) .....................................54

*Sporhase v. Nebraska*,

    458 U.S. 941, 102 S. Ct. 3456 (1982)...............................................36

*St. Johns River Water Mgmt. Dist. v. Koontz*,

    861 So. 2d 1267 (Fla. Dist. Ct. App. 2003).......................................19

*Star Fruit Co. v. Eagle Lake Growers*,

    33 So. 2d 858 (Fla. 1948) ...........................................................42, 48

# TABLE OF AUTHORITIES
## (continued)

Page

*State of Fla. ex rel. Fussell v. McClendon*,

    109 So. 2d 783 (Fla. Dist. Ct. App. 1959)........................................................28

*Stenograph LLC v. Bossard Assocs.*,

    144 F.3d 96 (D.C. Cir. 1998)..............................................................................53

*SunTrust Bank v. Houghton Mifflin Co.*,

    268 F.3d 1257 (11th Cir. 2001) .........................................................................55

*Sussex Mut. Ins. Co. v. Gabor*,

    568 So. 2d 1004 (Fla. Dist. Ct. App. 1990).......................................................30

*Tatum Bros. v. Watson*,

    109 So. 623 (Fla. 1926) .....................................................................................19

*Tedder v. Florida*,

    75 So. 783 (Fla. 1917) .......................................................................................52

*Vincent v. City Colls. of Chicago*,

    485 F.3d 919 (7th Cir. 2007) .............................................................................20

*Warshall v. Price*,

    629 So. 2d 903 (Fla. Dist. Ct. App. 1993).........................................................49

*WCVB-TV v. Boston Athletic Ass'n*,

    926 F.2d 42 (1st Cir. 1991)................................................................................48

**TABLE OF AUTHORITIES**
(continued)

Page

*White v. Massachusetts Council of Const. Emp'rs, Inc.*,

    460 U.S. 204, 103 S. Ct. 1042 (1983)...............................................37

*Workplace Corp. v. Office Depot, Inc.*,

    1990 WL 106727 (M.D. Fla. June 5, 1990) ......................................46

*Wyoming v. Oklahoma*,

    502 U.S. 437, 112 S. Ct. 789 (1992)................................................36

*Yaffee v. Int'l Co.*,

    80 So. 2d 910 (Fla. 1955) ................................................................28

*Zombori v. Digital Equip. Corp.*,

    878 F. Supp. 207 (N.D. Fla. 1995) .................................................30

## STATUTES & REGULATIONS

17 U.S.C. § 102 ....................................................................5, 22, 27

17 U.S.C. § 107 .................................................................................55

17 U.S.C. § 114 .................................................................................14

17 U.S.C. § 301 ....................................................................... *passim*

Cal. Code Civ. Proc. § 980.............................................................6, 26

Fla. Stat. § 540.11 (2015) ...............................................................3, 29

Fla. Stat. § 543.02 (1941) ........................................................ *passim*

## TABLE OF AUTHORITIES
(continued)

Page

FLA. STAT. § 772.11 (2015) ........................................................51

FLA. STAT. § 812.012 (2011) .....................................................29

FLA. STAT. § 812.014 (2011) .........................................29, 42, 51

* 47 C.F.R. § 25.144 (2015) ........................................................39

* 23 FCC Rcd. 12348 (2008) ......................................................39

## <u>LEGISLATIVE HISTORY</u>

1971 Sound Recording Act,

    Pub. L. No. 92-140, 85 Stat. 391 (1971)..........................................14

120 CONG. REC. 30,405 (1974) ............................................16

141 CONG. REC. S945-02 (Jan. 13, 1995) ...............................33

40 Fla. Sen. Journal 856 (June 3, 1977)...................................28

Assemb. Comm. on Judiciary, AB 3483, as introduced 3/12/82

    (Cal. Comm. Print 1982)....................................................26

Cal. Dept. of Fin., Enrolled Bill Rep. on AB 3483

    (1981-1982 Reg. Sess.) (Aug. 17, 1982) ............................26

Copyright Act of Aug. 18, 1856, ch. 169, 11 Stat. 138 (1856) ...........................25

*Copyright Law Revision: Hearings Before Subcomm. No. 3 of the H.*

    *Comm. on the Judiciary, Part 3*, 89th Cong. (Comm. Print 1965) ...................16

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Copyright Law Revision: Hearings Before the Subcomm. on Patents,*

    *Trademarks and Copyrights of the Sen. Comm. on the Judiciary,*

    *Part 2*, 90th Cong. (1967) ................................................................16

*Digital Performance Right in Sound Recordings Act of 1995:*

    *Hearings Before the Subcomm. on Courts and Intell. Prop. of the*

    *H. Comm. on the Judiciary*, 104th Cong. (1995) .............................17

Fla. H. Comm. on Commerce, HB 1780 (1977), Staff Report

    (Apr. 27, 1977)............................................................................28, 29

*General Investigation of Conditions Affecting the Income and*

    *Employment of Performing Artists: Hearings Before the Select*

    *Subcomm. on Ed. of the Comm. on Ed. and Labor*, 87th Cong.

    (Comm. Print 1962) ........................................................................15

* H.R. REP. NO. 104-274 (1995) ......................................................32, 33

*Performance Rights in Sound Recordings: Subcomm. on Courts, Civ.*

    *Liberties, and the Admin. of Justice of the H. Comm. on the*

    *Judiciary*, 95th Cong. (Comm. Print 1978). ...............................13, 14

Pub. L. 60-349, 35 Stat. 1075 (1909)....................................................27

*Revision of Copyright Laws: Hearings Before the H. Comm. on*

    *Patents,* 74th Cong. (Comm. Print 1936) ...................................15, 47

**TABLE OF AUTHORITIES**
(continued)

**Page**

* S. REP. NO. 104-128 (1995) ...............................................................33

SUPP. REGISTER'S REP. ON THE GENERAL REV. OF U.S. COPYRIGHT

    LAW (Comm. Print 1965) ..............................................................14

## OTHER AUTHORITIES

2 Melville Nimmer & David Nimmer, NIMMER ON COPYRIGHT (2015) ...............22

Douglas Baird, *Common Law Intellectual Property and the Legacy of*

    Int'l News Serv. v. Assoc. Press, 50 U. CHI. L. REV. 411 (1983) ....................11

Gary Pulsinelli, *Happy Together?  The Uneasy Coexistence of*

    *Federal and State Protection for Sound Recordings*,

    82 TENN. L.R. 167 (2014) ...........................................................34, 36

* Joseph Singer, PROPERTY (4th ed. 2014) ...........................................18

Julie Ross, *[Un]happy Together: Why the Supremacy Clause*

    *Preempts State Law Digital Performance Rights in Radio-Like*

    *Streaming of Pre-1972 Sound Recordings*, J. COPYRIGHT SOC'Y

    U.S.A. (forthcoming 2015), http://scholarship.law.

    georgetown.edu/facpub/1478/ ..........................................................17

# TABLE OF AUTHORITIES
## (continued)

**Page**

June Besek & Eva Subotnik, *Constitutional Obstacles? Reconsidering*

    *Copyright Protection for Pre-1972 Sound Recordings*,

    37 COLUM. J.L. & ARTS 327 (2014)................................................................11

Lauren Kilgore, *Guerrilla Radio: Has the Time Come for a Full*

    *Performance Right in Sound Recordings?*, 12 VAND. J. ENT. &

    TECH. L. 549 (2010)................................................................................11, 12

Neil Weinstock Netanel, *First Amendment Constraints on Copyright*

    *After* Golan v. Holder, 60 UCLA L. REV. 1082 (2013) ....................................55

R.H. Coase, *The Problem of Social Cost*, 3 J.L. & ECON. 1 (1960) .......................19

Ralph Brown, *The Semiconductor Chip Protection Act of 1984 and its*

    *Lessons: Eligibility for Copyright Protection: A Search for*

    *Principled Standards*, 70 MINN. L. REV. 579 (1986) .......................................11

Richard Posell, *'60s on 6' May Be in Sirius Trouble*, Daily Journal

    (Apr. 29, 2015)................................................................................................12

Richard Posner, ECONOMIC ANALYSIS OF LAW (8th ed. 2011).........................18, 19

Robert Gorman, *An Overview of the Copyright Act of 1976*, 126 U.

    PENN. L.R. 856 (1978) ....................................................................................22

Steven Seidenberg, *Pay to Play: State Copyright Law Now Gives*

    *Musicians Performance Rights*, A.B.A.J. (Apr. 2015)......................................12

# TABLE OF AUTHORITIES
## (continued)

Page

Steven Seidenberg, *US Perspectives: Courts Recognise New Performers' Rights,* Intell. Prop. Watch (Nov. 24, 2014), http://www.ip-watch.org ...................................................................11

\* Tyler Ochoa, *A Seismic Ruling on Pre-1972 Sound Recordings and State Copyright Law*, Technology & Marketing Blog (Oct. 1, 2014), http://blog.ericgoldman.org ...................................................11

\* U.S. COPYRIGHT OFFICE, COPYRIGHT AND THE MUSIC MARKETPLACE (2015), *available at* http://copyright.gov/policy/ musiclicensingstudy/copyright-and-the-music-marketplace.pdf.......................35

U.S. COPYRIGHT OFFICE, FEDERAL COPYRIGHT PROTECTION FOR PRE-1972 SOUND RECORDINGS: A REPORT OF THE REGISTER OF COPYRIGHTS (2011) ...........................................................................11

William Landes & Richard Posner, *Trademark Law: An Economic Perspective*, 30 J.L. & ECON. 265 (1987) ........................................................20

6 William Patry, PATRY ON COPYRIGHT (2010)....................................................22

William Patry, PATRY ON FAIR USE (2015) ...................................................21, 54

**INTRODUCTION**

Since the dawn of the radio industry nearly a century ago, recordings made prior to 1972 have been freely and widely performed without restriction, including by more than 8,000 AM/FM radio stations, restaurants, and retail stores in Florida alone.  Sirius XM, a national satellite radio broadcaster, does the same.  While the federal Copyright Act grants *composers* a right to receive royalties for public performances of their songs, no law—federal or state—grants pre-1972 *recording owners* a right to control or demand royalties for public performances of their recordings.  In the lawsuit below, plaintiff sought to upend this century-long consensus, arguing that Florida law provides pre-1972 recording owners an unfettered, unconditional right to control all performances of their recordings.

The district court rightly rejected plaintiff's argument, holding that Florida law does *not* grant pre-1972 recording owners "an unqualified property right." Appellant's Appendix ("FE") Vol. 2, Doc. 142 at 8.  The court also recognized that creating the common-law performance right sought by plaintiff would create widespread policy problems, harm competing stakeholders, and violate the settled principle that where, as here, creating a right would dramatically expand existing law and affect many stakeholders, the decision whether and how to establish this right should be left to the legislature.  *See Shands Teaching Hosp. & Clinics v.*

*Smith*, 497 So. 2d 644, 647 (Fla. 1986); *Horne v. Vic Potamkin Chevrolet, Inc.*, 533 So. 2d 261, 262 (1988).

Plaintiff's efforts to challenge that ruling fail. As plaintiff concedes, there is *no* Florida case or statute recognizing a performance right in pre-1972 recordings. The last case from any jurisdiction to address the existence of a common-law performance right, *RCA Manufacturing Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940), held squarely that there was none. Even more telling are the express acknowledgments by pre-1972 recording owners, made while lobbying Congress to create a statutory performance right, that no such right exists under state law. Plaintiff urges the Court to ignore these admissions because they were made in the context of debates over federal law. But these statements, and the broader debate over whether to amend the federal Copyright Act to include a performance right, are relevant because they confirm that *no performance right existed under Florida law*. Recording owners would not have spent nearly 80 years trying to persuade Congress to create a right they already had at common law.

Plaintiff argues that despite the complete absence of authority granting a performance right, and the settled understanding that no such right exists, Florida law has *always* provided pre-1972 recording owners an unlimited right to control performances of their recordings. In support of its argument, plaintiff conflates general principles of real and personal property law, Florida law addressing record

2

piracy, and Florida's civil theft statute.  As the district court held, none of these sources creates the performance right plaintiff seeks.

Property ownership is never absolute—it is always subject to the legitimate interests of other stakeholders.  This is particularly true of copyright ownership, which has "never accorded the copyright owner complete control over all possible uses of his work.'"  FE Vol. 2, Doc. 142 at 8.  Plaintiff objects that the district court cited a federal case, *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 431, 104 S. Ct. 774 (1984), for this proposition, but the same settled principle applies to copyright ownership under Florida common law.

The only right Florida law provides pre-1972 recording owners is a right to prevent unauthorized copying and distribution—*i.e.*, record piracy.  *CBS, Inc. v. Garrod*, 622 F. Supp. 532 (M.D. Fla. 1985); FLA. STAT. § 540.11 (2015).  Making a bootleg copy of a record and selling it in direct competition with the owner is very different than buying a record and playing it—the exact purpose for which it was created.  While states have always granted limited protection against piracy, states have never allowed recording owners to prevent record-purchasers (including broadcasters) from performing lawfully obtained records.

There is a second, alternative basis to affirm:  even if Florida law *did* grant pre-1972 recording owners an absolute right to control all performances, it would violate the Commerce Clause to apply that right to Sirius XM, which is required by

the FCC to broadcast uniformly nationwide.  The district court held that Sirius XM's Commerce Clause argument was moot, but noted in dicta that Section 301(c) of the Copyright Act immunizes state laws regulating pre-1972 recordings from Commerce Clause scrutiny.  That misreads Section 301(c), which saves state laws regulating pre-1972 recordings from express preemption, but does not authorize states to burden interstate commerce.

Given that plaintiff has no protectable property interest in performances of its recordings, the district court correctly dismissed plaintiff's unfair competition, conversion, and civil theft claims—which would fail on the merits in any event.  The court also correctly held that buffer and cache copies necessary to facilitate Sirius XM's broadcasts—which are temporary, fragmentary, and *never* accessible to the public—are not actionable and are protected by the doctrine of fair use.  The judgment should be affirmed.

## STATEMENT OF ISSUES

1.a.  Whether the district court correctly held that, as a matter of Florida law, the owner of a pre-1972 recording does not have an unfettered, unconditional right to control all performances of that recording.

1.b.  Alternatively, whether a Florida common law right to control all performances of pre-1972 recordings would violate the U.S. Constitution's

4

Commerce Clause as applied to interstate broadcasters that, like Sirius XM, are required to have nationally uniform broadcasts.

2.  Whether the district court correctly held that plaintiff's unfair competition, conversion, and civil theft claims—all of which are based on Sirius XM's broadcasts of pre-1972 recordings—fail as a matter of law.

3.  Whether the district court correctly held that temporary, fragmentary reproductions of pre-1972 recordings made by Sirius XM to facilitate its broadcasts—which cannot be downloaded, streamed, or otherwise accessed by the public—are not actionable and/or are protected by the doctrine of fair use.

## STATEMENT OF RELEVANT FACTS

Plaintiff claims to own certain pre-1972 recordings of songs by The Turtles.[1] As with all sound recordings since the inception of the record and broadcast industries, these recordings have been freely played on the radio without any need for consent or demand for compensation.  Appellee's Supplemental Appendix ("SXM") Vol. 1, Doc. 78 ¶¶ 33-36; Doc. 81-2 at 99:1-100:4; Doc. 81-3 at 165:12-166:14, 167:17-168:12; Doc. 81-4 at 3-10.  In 2013, plaintiff filed lawsuits in California, New York, and Florida claiming, for the first time, that it has an

---

[1] This lawsuit concerns sound recordings—*i.e.*, the medium on which a particular performance of a song is fixed—rather than musical compositions—*i.e.*, the notes and lyrics written by a song's composer.  Sound recordings fixed prior to February 15, 1972 are governed by state law.  17 U.S.C. § 301(c).  Musical compositions are protected by the federal Copyright Act.  17 U.S.C. § 102(a)(2).

absolute right to block and control all performances of its recordings.[2]  In this

action, plaintiff alleged that Sirius XM violated Florida law by performing pre-

1972 recordings owned by plaintiff and making internal, incidental reproductions

(*i.e.*, buffer and cache copies) to facilitate those performances.  FE Vol. 1, Doc. 36.

Sirius XM moved for summary judgment on three grounds.  First, Sirius

XM's broadcasts are lawful because Florida law does not provide any performance

right to pre-1972 recording owners.  FE Vol. 1, Doc. 77 at 5-18.  Second, even if

there were a performance right, applying it to Sirius XM's nationally uniform

broadcasts would violate the Commerce Clause.  *Id.* at 18-20.  Third, incidental

reproductions made by Sirius XM to facilitate its broadcasts are not actionable and

are protected by the doctrine of fair use.  FE Vol. 2, Doc. 101 at 9-10.

On June 22, 2014, the district court granted Sirius XM's motion.  FE Vol. 2,

Doc. 142.  As to the first issue, the court held that Florida law does not give pre-

1972 recording owners any right to control performances, and observed that such a

---

[2] In the California case, the court held that California Civil Code Section 980(a) grants a performance right to pre-1972 recording owners.  2014 WL 4725382, at *9 (C.D. Cal. Sept. 22, 2014).  That issue is currently on appeal before the Ninth Circuit in a parallel case Flo & Eddie filed against Pandora.  *Pandora Media, Inc. v. Flo & Eddie, Inc.*, Appeal No. 15-55287 (9th Cir.).

In the New York case, the court held that New York common law provides a performance right to pre-1972 recording owners, though it recognized this was a "thorn[y] question … of first impression" with substantial grounds for difference of opinion and certified its ruling for interlocutory appeal.  62 F. Supp. 3d 325, 339 (S.D.N.Y. 2014); 2015 WL 585641, at *2-*3 (S.D.N.Y. Feb. 10, 2015).  The Second Circuit accepted that interlocutory appeal, which remains pending.

right could only be created by a legislature. *Id.* at 8-10. On the second issue, the court held that Sirius XM's Commerce Clause argument was moot, but noted that it would fail in any event because Section 301(c) of the Copyright Act immunizes state laws concerning pre-1972 recordings from Commerce Clause scrutiny. *Id.* at 11. On the third issue, the court held that the buffer and cache copies made by Sirius XM to facilitate its broadcasts are lawful. *Id.* at 10. Plaintiff filed a notice of appeal on July 10, 2015. FE Vol. 2, Doc. 143.

## SUMMARY OF ARGUMENT

As the district court held, Florida law has *never* granted pre-1972 recording owners an absolute, unfettered right to control performances of those recordings. It has long been understood that no such right exists, and plaintiff's effort to find one in general principles of real and personal property law, Florida law addressing record piracy, and Florida's civil theft statute is unavailing. Florida, like other states, has recognized only limited rights in pre-1972 recordings to prevent unauthorized copying and distribution—*i.e.*, record piracy. *See Garrod*, 622 F. Supp. at 534-36. But Florida, like other states, has never recognized any right to prevent performances of pre-1972 recordings by those who lawfully obtain copies.

The district court also recognized that creating the common-law performance right sought by plaintiff would create widespread policy problems and violate the settled principle that where, as here, creating a right would

7

significantly expand existing law and harm competing stakeholders, it should be a matter of legislative balancing rather than judicial will.  *See Shands*, 497 So. 2d at 647; *Horne*, 533 So. 2d at 262.

Even if Florida law did grant pre-1972 recording owners a performance right, it would violate the Commerce Clause to enforce that right against Sirius XM, which is required by the FCC to have nationally uniform satellite broadcasts and cannot tailor its broadcasts by state.  The district court's assumption that Section 301(c) of the Copyright Act immunizes state laws regulating pre-1972 recordings from Commerce Clause scrutiny was error—Section 301(c) saves such laws from express preemption by the Copyright Act, but does not authorize states to burden interstate commerce.

Given that plaintiff has no protectable property interest in performances of its pre-1972 recordings, the district court correctly dismissed its unfair competition, conversion, and civil theft claims—which would fail on the merits in any event.  The court also rightly held that buffer and cache copies necessary to facilitate Sirius XM's broadcasts—which are temporary, fragmentary, and never accessible to the public—are not actionable and constitute fair use.

## ARGUMENT

**I.    THE DISTRICT COURT RIGHTLY HELD THAT FLORIDA LAW DOES NOT GIVE OWNERS OF PRE-1972 RECORDINGS AN UNFETTERED RIGHT TO CONTROL ALL PERFORMANCES.**

As the district court recognized, and plaintiff concedes, there is *no* Florida case or statute recognizing a pre-1972 recording owner's right to control performances of that recording by those who have lawfully obtained a copy. FE Vol. 2, Doc. 142 at 8. To the contrary, the longstanding and unanimous consensus has been that no such right exists. Plaintiff nonetheless argues that a performance right has *always* existed under Florida law. Plaintiff relies on three sources for this supposed right: (1) general principles of real and personal property law, (2) Florida law granting a limited right to prevent record piracy, and (3) Florida's civil theft statute. Appellant's Brief ("Br.") at 20-32, 41-43. As the district court held, none of these sources creates a performance right.

**A.    Plaintiff Seeks To Reverse A Decades-Long Consensus That State Law Does Not Provide A Performance Right.**

Understanding the flaws in plaintiff's substantive arguments begins with the historical backdrop against which they arise. Since the invention of the phonograph, pre-1972 recordings have been performed for the public without restriction or liability, including by more than 8,000 AM/FM radio stations and businesses in Florida alone. SXM Vol. 1, Doc. 78 ¶ 44. None of those radio stations or businesses has ever been sued for its performance of pre-1972

9

recordings.  That is because pre-1972 recording owners have never had a right to demand licenses or compensation for performances.  Before plaintiff's recent spate of lawsuits, the last time a recording owner challenged a broadcaster's performance of its recording was 1940.  *Whiteman*, 114 F.2d at 87.  *Whiteman* was the only other case to analyze a claimed common-law performance right, and it held that no such right exists.

In *Whiteman*, a record company and orchestra leader brought a copyright infringement claim under New York common law against a radio network that broadcast their records.  That claim raised the question whether the performer and/or record company "had any musical property at common-law in the records" that was infringed when the radio network played the records on air.  *Id.*  Judge Learned Hand's opinion for the Court held that radio performance of the recordings did not infringe any property right because common law rights in a recording "consist[] *only* in the power to prevent others from *reproducing* the copyrighted work."  *Id.* at 88 (emphasis added).  By simply playing the records on air, the radio network "never invaded any such right of [the performer]"—indeed, they "never copied his performances at all," but instead "merely *used* those copies which he and the [record company] made and distributed."  *Id.* (emphasis added).  The radio network thus could not be liable for broadcasting the records.

*Whiteman* established a longstanding, nationwide "consensus that state law does not provide a public performance right for sound recordings." Tyler Ochoa, *A Seismic Ruling on Pre-1972 Sound Recordings and State Copyright Law*, Technology & Marketing Blog (Oct. 1, 2014), http://blog.ericgoldman.org. As many commentators have observed, *Whiteman* established "that there is no performance right in a sound recording," "put radio on solid legal ground to play records without compensating performers for the next seventy years," and "turned the tide against judges creating" a "common law performers' right." Steven Seidenberg, *US Perspectives: Courts Recognise New Performers' Rights,* Intell. Prop. Watch (Nov. 24, 2014), http://www.ip-watch.org; Lauren Kilgore, *Guerrilla Radio: Has the Time Come for a Full Performance Right in Sound Recordings?*, 12 VAND. J. ENT. & TECH. L. 549, 572, 559-60 (2010); Ralph Brown, *The Semiconductor Chip Protection Act of 1984 and its Lessons: Eligibility for Copyright Protection: A Search for Principled Standards*, 70 MINN. L. REV. 579, 585-86 (1986).[3] *Whiteman* remains good law on this performance-right issue.[4]

_____

[3] *See also* Douglas Baird, *Common Law Intellectual Property and the Legacy of* Int'l News Serv. v. Assoc. Press, 50 U. CHI. L. REV. 411, 419 n.35 (1983) (the "law did not (and in fact still does not) give a performer the right to control radio broadcasts of his performances"); U.S. COPYRIGHT OFFICE, FEDERAL COPYRIGHT PROTECTION FOR PRE-1972 SOUND RECORDINGS: A REPORT OF THE REGISTER OF COPYRIGHTS 44-45 (2011) (citing *Whiteman* and explaining that, although states *could* interpret common law as providing a performance right, "state law does not appear to recognize a performance right in sound recordings"); June Besek & Eva Subotnik, *Constitutional Obstacles? Reconsidering Copyright*

Aside from *Whiteman*, during the decades-long debate in Congress over whether to create a statutory performance right, pre-1972 recording owners expressly and repeatedly acknowledged that no such right existed under state law. Plaintiff argues these statements are irrelevant because they were made in the context of debates over federal law rather than Florida law.  But these statements—

---

*Protection for Pre-1972 Sound Recordings*, 37 COLUM. J.L. & ARTS 327, 338 (2014) ("states do not appear to recognize a right of public performance in pre-1972 sound recordings"); Steven Seidenberg, *Pay to Play: State Copyright Law Now Gives Musicians Performance Rights*, A.B.A.J. (Apr. 2015) (state law "did not provide performers or record labels with public performance rights … according to the seminal case of [*Whiteman*]"); Richard Posell, *'60s on 6' May Be in Sirius Trouble*, Daily Journal (Apr. 29, 2015) (district court's ruling "challenges the common understanding of state copyrights since at least 1940").

[4] Plaintiff argued below that *Whiteman* was overruled by *Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657 (2d Cir. 1955), and *Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540 (2005).  Plaintiff misreads *Mercury Records* and *Naxos*, which were record piracy cases involving the *unauthorized reproduction and distribution* of bootleg copies, and had nothing to do with the relevant issue in *Whiteman*—*i.e.*, the right to control *performances*.

*Mercury Records* and *Naxos* did reject dictum in *Whiteman* that is irrelevant here.  In *Whiteman*, Judge Hand considered whether the sale of a record constituted a "publication" that extinguished its common law copyright under federal preemption principles, and opined that after a record's sale, "anyone may copy it who chances to hear it, and may use it as he pleases."  114 F.2d at 89.  *Mercury Records* held that this statement "is not the law of the State of New York," because in that state the "public sale" of a record "does not constitute a dedication of the right to *copy and sell* the record[]."  221 F.2d at 663 (emphasis added); *see Naxos*, 4 N.Y.3d at 553-55.  This rejection of *Whiteman*'s dictum has no relevance either to *Whiteman*'s central holding or to this case, both of which are about the *performance* of recordings lawfully obtained, not *copying and selling* them without permission.  As commentators have consistently recognized—including *after Mercury Records* and *Naxos*—*Whiteman* remains good law on the performance issue.  *See* Kilgore, *supra*, at 572, 559-60 (*Mercury Records* overruled *Whiteman* on a different issue); *supra* at 11 & n.3.

12

and the broader debate over whether to amend the federal Copyright Act to include a performance right—are relevant because they confirm that *no performance right existed under Florida law* (or the law of any other state).  There would have been no reason for pre-1972 recording owners to invest decades of time and effort in trying to persuade Congress to create a right they already had at common law.

The debate over whether to create a performance right under federal law dates back nearly a century.  Until 1971, the Copyright Act did not recognize any rights in sound recordings at all.  Congress understood that granting rights to recording owners (in most cases, the record company) could harm competing stakeholders, including composers (who have a copyright in the underlying musical composition), performing artists, broadcasters, and the public.  For that reason, Congress rejected proposals by the recording industry to extend copyright protection to recordings in 1909, 1925, 1926, 1930, 1932, 1936, 1937, 1939, 1940, 1942, 1943, 1945, 1947, and 1951.  *See Performance Rights in Sound Recordings: Subcomm. on Courts, Civ. Liberties, and the Admin. of Justice of the H. Comm. on the Judiciary*, 95th Cong., 29-37 (Comm. Print 1978).

The advent of new technology in the 1950s and 1960s, however, enabled pirates to copy recordings and sell these "bootleg" copies.  This problem did not solely affect recording owners—all stakeholders suffer from record piracy, which does not generate any record sales, music royalties, or advertising revenue and

creates quality control problems.  The recording industry introduced various measures to Congress addressing record piracy, but those measures repeatedly failed to pass because they included not only prohibitions against piracy itself— *i.e.*, unauthorized copying and sale—but rights to control performances of recordings lawfully obtained.  *See id.* at 42-50.  While there was widespread support for an anti-copying right, the proposed performance right was "explosively controversial," as it would grant a windfall to recording owners at the expense of composers and performing artists (since any restrictions on performances would decrease the number of times their songs are played and the consequent publishing royalties and publicity they receive) as well as broadcasters and the public (who would face increased costs and decreased access to recordings).  SUPP. REGISTER'S REP. ON THE GENERAL REV. OF U.S. COPYRIGHT LAW 38 (Comm. Print 1965) (SXM Vol. 2, Doc. 81-23 at 2).

In the 1971 Sound Recording Act, Congress addressed record piracy by creating a prospective, limited anti-copying right in post-1972 recordings that protected against unauthorized *copying and distribution* only.  Pub. L. No. 92-140, 85 Stat. 391 (1971) (SXM Vol. 1, Doc. 81-16).  The 1976 Copyright Act reaffirmed this limited anti-copying right for post-1972 recordings and expressly rejected a performance right.  17 U.S.C. § 114(a).

The written history of Congress's consideration of whether and how to create a performance right makes clear that, as all parties understood, state law did not *already* provide such a right. As various stakeholders observed, the whole point of the decades-long debate was to create a right the states did not already recognize. One record executive stated to Congress in 1936 that the "law up to date has not granted" protection against radio stations' "indiscriminate use of phonograph records." *Revision of Copyright Laws: Hearings Before the H. Comm. on Patents,* 74th Cong. 622 (Comm. Print 1936) (SXM Vol. 1, Doc. 81-18 at 622).

Almost three decades later, performing artists complained to Congress about the absence of royalties "from repeated use" of "[p]laying [records] on radios," explaining that while performers are paid "for each copy of the record that is sold[,] from there on, that one record can be used ad infinitum and [performers] get nothing." *General Investigation of Conditions Affecting the Income and Employment of Performing Artists: Hearings Before the Select Subcomm. on Ed. of the Comm. on Ed. and Labor*, 87th Cong., 64 (Comm. Print 1962) (SXM Vol. 1, Doc. 27-3 at 64-65); *see id.* ("[T]he present copyright law does not provide a continuing right of the performer in his preserved performance, and until the copyright law provides that, that will be the situation."). In 1965, the Register of Copyrights observed that a proposed bill "denying [record companies] rights of public performance ... reflects—accurately, I think—the present state of thinking

on this subject in the United States." *Copyright Law Revision: Hearings Before Subcomm. No. 3 of the H. Comm. on the Judiciary, Part 3*, 89th Cong. 1863 (Comm. Print 1965) (SXM Vol. 2, Doc. 81-24 at 1863).

Two years later, a major record company, Capitol Records, bemoaned the lack of any performance right: "The record company receives nothing from the widespread performance-for-profit of its products …. There is no clearly established legal remedy available to stop this unauthorized use." *Copyright Law Revision: Hearings Before the Subcomm. on Patents, Trademarks and Copyrights of the Sen. Comm. on the Judiciary, Part 2*, 90th Cong. 496, 502 (1967). And when Congress rejected these complaints and declined to create a performance right in the 1976 Copyright Act, it confirmed that the statute "merely states what has been the law and the widely accepted fact for many years—namely, there is no compensable property right in sound recordings and no … performance royalty for broadcasters because they play records for profit." 120 CONG. REC. 30,405 (1974).

The recording industry did not give up, and continued its efforts in the 1980s and 1990s to establish by legislation what it *concededly* did not have under state law. *See Bonneville Int'l Corp. v. Peters*, 347 F.3d 485, 488 (3d Cir. 2003) (after 1971 Sound Recording Act, "[t]he recording industry had repeatedly sought ... additional copyright protection in the form of a performance copyright").

16

In 1995, Congress enacted the Digital Performance Right in Sound Recordings Act ("DPRA"), which established a *limited* digital performance right restricted to post-1972 recordings. During debate over the DPRA, the Recording Industry Association of America ("RIAA")—which filed an amicus brief in support of plaintiff's position—advised Congress that, "[u]nder existing law, record companies ... have no rights to authorize or be compensated for the public performance of the sound recording." *Digital Performance Right in Sound Recordings Act of 1995: Hearings Before the Subcomm. on Courts and Intell. Prop. of the H. Comm. on the Judiciary*, 104th Cong. 31 (1995) (SXM Vol. 2, Doc. 81-20 at 1); *see also* Julie Ross, *[Un]happy Together: Why the Supremacy Clause Preempts State Law Digital Performance Rights in Radio-Like Streaming of Pre-1972 Sound Recordings*, J. COPYRIGHT SOC'Y U.S.A. 18 (forthcoming 2015), http://scholarship.law.georgetown.edu/facpub/1478/ (legislative history of DPRA confirms "the assumption by Congress, the Copyright Office, and all interested parties … that the [DPRA] created a new, narrowly-defined performance right that simply had not existed for sound recordings under either federal or state law").

In the face of *Whiteman* and nearly 80 years of admissions by recording owners that state law does not provide any right to control performances of their recordings, plaintiff's *ipse dixit* that Florida law has always provided a performance right defies credulity. *See Halstead v. Grinnan*, 152 U.S. 412, 416,

14 S. Ct. 641 (1894) (where "a party comes into court and asserts that he has been for many years the owner of certain rights, of whose existence he has had full knowledge, and yet has never attempted to enforce them, there is a strong persuasion that … his alleged rights either never existed or had long since ceased").  It also fails on the merits, as explained below.

### B.    Florida Law Governing Real And Personal Property Does Not Provide A Performance Right.

Plaintiff's basic theory is that property rights in a pre-1972 recording are absolute and therefore necessarily include a right to control performances of that recording by those who purchase or otherwise lawfully obtain it.  Plaintiff relies principally on cases applying general principles of real and personal property law, but those principles do not support the intangible property right plaintiff seeks to create.  Even on their own terms, real and personal property rights are not all-encompassing, and intangible rights are even less absolute.

As Judge Posner has explained, "[t]ruly exclusive (absolute, unqualified) property rights would be a contradiction in terms."  Richard Posner, ECONOMIC ANALYSIS OF LAW § 3.6 (8th ed. 2011).  Any rights in property are always limited by "the legitimate interests of others."  Joseph Singer, PROPERTY § 1.1.2 (4th ed. 2014); FE Vol. 2, Doc. 101 at 2.  For example, a landowner has no inherent right to build a skyscraper, drill into the ground, or alter the land's natural character.  *See Graham v. Estuary Props., Inc.*, 399 So. 2d 1374, 1382 (Fla. 1981) (landowner

18

"has no absolute and unlimited right to change the essential natural character of his land" in a way that "injures the rights of others"); Posner, *supra*, §§ 3.2, 3.8, 3.9 (landowner's right to build structures, extract oil, and use water may be limited to protect others); R.H. Coase, *The Problem of Social Cost*, 3 J.L. & ECON. 1, 44 (1960) ("[W]hat the land-owner in fact possesses is the right to carry out a circumscribed list of actions.  The rights of a land-owner are not unlimited.").

Intangible property rights of the kind plaintiff claims are even more contingent than the real and personal property rights plaintiff cites by analogy.[5] Copyright, as the Supreme Court has recognized, is "no ordinary chattel." *Dowling v. U.S.*, 473 U.S. 207, 216-17, 105 S. Ct. 3127 (1985) (discussing federal copyright law and noting that "property rights of a copyright holder have a character distinct from the possessory interest of a [real property owner]"). Ownership of a copyright "has *never* accorded … complete control over all possible uses of [the] work"—rather, "like other intellectual property," copyright

---

[5] The cases plaintiff cites involve real property, *Dep't of Law Enf't v. Real Prop.*, 588 So. 2d 957 (Fla. 1991); *Tatum Bros. v. Watson*, 109 So. 623 (Fla. 1926); *St. Johns River Water Mgmt. Dist. v. Koontz*, 861 So. 2d 1267 (Fla. Dist. Ct. App. 2003), or personal property, *Costa Del Sol Ass'n, Inc. v. State Dep't of Bus. & Prof'l Reg.*, 987 So. 2d 734 (Fla. Dist. Ct. App. 2008); *Liquor Store v. Cont'l Distilling Corp.*, 40 So. 2d 371 (Fla. 1949), or are otherwise plainly inapposite, *Dickman v. Comm'r*, 465 U.S. 330, 336, 104 S. Ct. 1086 (1984) (discussing definition of property under Internal Revenue Code in interpreting gift-tax provisions); *Dep't of Ins. v. Dade Cty. Cons. Advocate's Office*, 492 So. 2d 1032, 1039 n.3 (Fla. 1986) (Boyd, C.J., dissenting) (criticizing majority's decision to invalidate law curtailing insurance agents' rights to negotiate commission rates).

"comprises a series of carefully defined and carefully delimited interests to which the law affords correspondingly exact protections." *Id.* (emphasis added); *see* William Landes & Richard Posner, *Trademark Law: An Economic Perspective*, 30 J.L. & ECON. 265, 268 (1987) ("intellectual property is a particularly costly form of property" and is thus "limited in ways that physical property is not").

It accordingly does not follow that ownership of a pre-1972 recording gives the owner an absolute right to control all performances of the recording by those who lawfully obtain a copy. That result on its face makes no sense. Because plaintiff's categorical "property ownership" theory does not (and cannot) define the specific rights attendant to ownership, it necessarily would allow the owner of a pre-1972 recording to prohibit a consumer who lawfully purchased a copy from playing it at a private party, listening to it in the car with the windows down, or re-selling it to a used record store. It would also mean that virtually every person who has played a record made before 1972 in Florida has broken the law. No precedent or policy supports that result. *Cf. Vincent v. City Colls. of Chicago*, 485 F.3d 919, 923 (7th Cir. 2007) (under first-sale doctrine recognized by federal copyright law, "once a given copy has been sold its owner may do with it as he pleases (provided that he does not create another copy or a derivative work)"); *accord Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1447-48 (11th Cir. 1998). For these reasons, the district court correctly recognized that Florida property law does not

provide an "unqualified property right" that allows plaintiff to "control everything related to the performance of the sound recordings."  FE Vol. 2, Doc. 142 at 8.

### C.  Florida Common Law Copyright Only Provides A Limited Anti-Copying Right, And Does Not Provide A Performance Right.

The performance right plaintiff claims has no more basis in Florida law governing common-law copyrights than it does in Florida real and personal property law.  Common law copyright ownership certainly is not unlimited, as plaintiff asserts.  Plaintiff cites no Florida case so much as suggesting that copyright encompasses all conceivable uses of a copyrighted work, including an unfettered right to control all performances of a pre-1972 recording.  No such case exists.  To the contrary, as the district court observed, "'[c]opyright protection has never accorded the copyright owner complete control over all possible uses of his work.'"  FE Vol. 2, Doc. 142 at 8 (citing *Sony*, 464 U.S. at 431); *accord Dowling*, 473 U.S. at 216-17.

Plaintiff devotes several pages of its brief to arguing that *Sony* is inapplicable because it involved federal, rather than common-law, copyright.  Br. at 29-32.  Plaintiff misses the point:  federal and common-law copyrights are distinct, but *both* are inherently limited in nature.  *See* William Patry, PATRY ON FAIR USE § 2:3 (2015) ("[i]t is appropriate that there be responsively expansive limitations and exceptions" on common-law copyright as under the federal

21

Copyright Act);[6] 2 Melville Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 8C.02 (2015) (surveying state cases and observing that common-law copyrights are limited and do *not* prevent "any unauthorized use of a work").

And in defining the scope of common-law copyright, courts frequently look to federal law for guidance.[7] *See, e.g.*, *Garrod*, 622 F. Supp. at 536 (looking to federal law to determine scope of common-law rights in pre-1972 recordings); *EMI Records Ltd. v. Premise Media Corp. L.P.*, 2008 WL 5027245 (N.Y. Sup. Ct. Aug.

_____

[6] Plaintiff cites Patry for the opposite proposition—*i.e.*, that common-law copyrights are supposedly "broader than federal copyrights." Br. at 30. But Patry merely cited *Naxos*, 4 N.Y.3d at 540, to note that *New York* law governing common-law copyrights is "broad." 6 William Patry, PATRY ON COPYRIGHT § 18:55 (2010). *Naxos* did not suggest that New York common-law copyrights are unlimited; it conducted an exhaustive review of protections afforded to recording owners over the past century, and concluded only that New York law gives recording owners a limited right to prevent record piracy. 4 N.Y.3d at 552-62.

[7] This is particularly true because federal copyright law is far more developed than state common law. Historically, the federal Copyright Act governed any works that had been published, and now extends to any works fixed in a tangible medium of expression (with a few exceptions, including pre-1972 recordings). 17 U.S.C. § 102; *see* Robert Gorman, *An Overview of the Copyright Act of 1976*, 126 U. PENN. L.R. 856, 857 (1978). This leaves a relatively small sliver of works to common-law copyright, and as a result, state law is more sparse.

Even outside the copyright context, Florida courts often look to federal law in deciding issues of first impression. *See, e.g.*, *R.J.L. v. State,* 887 So. 2d 1268, 1274-75, 1280 (Fla. 2004) (relying on federal cases to determine scope of gubernatorial pardons); *Am. Honda Motor Co. v. Votour*, 435 So. 2d 368, 369 (Fla. Dist. Ct. App. 1983) (following federal approach on issue of corporate law); *Moore v. State*, 473 So. 2d 686, 687-88 (Fla. Dist. Ct. App. 1984) (relying on federal case to determine sufficiency of evidence needed to sustain conviction under state law).

8, 2008) (applying federal fair use factors to common-law claim); *Kramer v. Thomas*, 2006 WL 4729242, at *9-11 (C.D. Cal. Sept. 28, 2006) (same).

The district court correctly rejected plaintiff's categorical argument that common-law copyright is unlimited, and instead looked to what Florida law actually provides. The sole case addressing the scope of common-law rights in pre-1972 recordings under Florida law—the federal trial court decision in *Garrod*—held only that a recording owner has a right to prevent record piracy. In *Garrod*, defendants made bootleg copies of recordings owned by CBS and sold them in direct competition with CBS—a classic example of record piracy. 622 F. Supp. at 533. Defendants primarily argued that CBS lost whatever common-law copyrights it had by "publishing" its recordings (*i.e.*, selling them to the public). *Id.* The court rejected this argument, and held that CBS could prevent the unauthorized copying and sale of its recordings under the doctrines of unfair competition, conversion, and theft. *Id.* at 535-36. The court did *not* hold, or even suggest, that a recording owner has a right to control all uses of a recording that was lawfully purchased from the owner (not to mention performances).[8]

*Garrod* was consistent with the laws of other states and then-existing federal law, which *only* recognized rights to prevent unauthorized copying and distribution

---

[8] The only other case plaintiff cites, *SmokEnders, Inc. v. Smoke No More, Inc.*, 1974 WL 20234 (S.D. Fla. Oct. 21, 1974), had nothing to do with pre-1972 recordings, and like *Garrod*, only recognized a right to prevent the unauthorized copying of a work—in that case, smoking cessation manuals and handouts.

of recordings for the express purpose of combatting piracy. *See Naxos*, 4 N.Y.3d at 544, 565 (recording owner could prevent competing record company from copying and distributing its songs); *accord Whiteman*, 114 F.2d at 88 ("only" common-law right in recordings is "the power to prevent others from reproducing" them); *Capitol Records v. Erickson*, 2 Cal. App. 3d 526, 533-34 (1969) ("misappropriation of unpatentable or uncopyrightable property by a competitor constituted unfair competition"); *supra* at 14 (describing Congress's narrow approach in 1976 Copyright Act).

Plaintiff conflates piracy with performance, failing to recognize that making a bootleg copy of a record and selling it in direct competition with the recording owner is very different than buying a record and playing it—the exact purpose for which it was created. Since the emergence of record piracy, Congress and the states have consistently granted protections against it, based on a recognition that *all* legitimate stakeholders suffer from record piracy. *Supra* at 13-14. Creating a right to control performances of lawfully obtained recordings, on the other hand, has always been "explosively controversial," since the majority of stakeholders benefit from the unrestricted performance of recordings. *Id.*

Finally, plaintiff argues that the court should have followed the other *Flo & Eddie* trial courts, which recognized performance rights under New York and California law, respectively. Br. at 22 n.7. As the district court recognized, those

24

decisions do not involve Florida law.  FE Vol. 2, Doc. 142 at 7-8.  They also are

wrong even on their own terms, and unlikely to survive pending appeals.

In the New York case, the court acknowledged that there is no case granting

a performance right to pre-1972 recording owners, but misinterpreted the stark lack

of authority supporting such a right to mean it *does* exist under New York common

law.  In fact, the law was the opposite:  *Whiteman* had expressly rejected a

performance right under New York common law.  *Supra* at 10-11 & n.4.  In

addition to misreading *Whiteman*, the New York trial court relied on the irrelevant

fact that some New York precedents had recognized performance rights in plays

and films.  62 F. Supp. 3d at 339.  Those cases are not analogous—sound

recordings involve different policy interests than other creative works, and courts

have only recognized performance rights in plays and films where, unlike here,

Congress had already balanced the policy interests and recognized a corollary right

under federal law.  *See* Copyright Act of Aug. 18, 1856, ch. 169, 11 Stat. 138

(1856) (creating performance right in plays); *French v. Maguire*, 1878 WL 11310,

at *5 (N.Y. Sup. Ct. 1878) (recognizing common law performance right in

unpublished plays); *Patterson v. Century Prods.*, 93 F.2d 489, 493-94 (2d Cir.

1937) (acknowledging federal performance right in films); *Brandon Films, Inc. v.

Arjay Enters., Inc.*, 230 N.Y.S.2d 56, 58 (Sup. Ct. 1962) (recognizing common law

performance right in unpublished films).  In any event, there are no Florida cases recognizing a performance right in plays, films, or any other creative work.

Even while recognizing a performance right for the first time under New York law, the New York court described the issue as a "thorn[y] question" as to which there are substantial grounds for difference of opinion, and asked the Second Circuit to provide "authoritative guidance."  62 F. Supp. 3d at 339; 2015 WL 585641, at *2 (S.D.N.Y. Feb. 10, 2015).  The Second Circuit granted Sirius XM's petition for interlocutory appeal, which is now pending.

In the California case, the court also recognized that there is no case granting a performance right to pre-1972 recording owners, but held that California Civil Code Section 980(a)—which was amended in 1982 to provide that the owner of a pre-1972 recording has "exclusive ownership" therein—created a broad new performance right.  This ruling was erroneous for various reasons, including because the legislative history of Section 980(a) makes clear that it was amended to "maintain" existing rights and make "technical and minor" changes to conform California law to the federal Copyright Act—not to create a broad, unlimited performance right that had never before existed under state *or* federal law.  *See* Assemb. Comm. on Judiciary, AB 3483, as introduced 3/12/82, at 1-2 (Cal. Comm. Print 1982); Cal. Dept. of Fin., Enrolled Bill Rep. on AB 3483 (1981-1982 Reg. Sess.) (Aug. 17, 1982).  In any event, there is no corollary to Section 980(a) under

Florida law.  The California court's interpretation of California law is currently

under review by the Ninth Circuit in a parallel case.  *Supra* n.2.

### D.    Florida Statutory Law Does Not Provide A Performance Right.

Finding no support for its position in Florida common law, plaintiff next

turns to the Legislature's 1977 repeal of Florida Statute Section 543.02 and

Florida's civil theft statute to find support for a performance right.  These sources

are unavailing.

In 1941, the Legislature enacted Section 543.02, which abolished any

common-law rights in recordings that had been sold to the public.  FLA. STAT.

§ 543.02 (1941).  This was consistent with the then-existing federal Copyright Act,

which governed copyrights in all works that had been "published."  Pub. L. 60-

349, 35 Stat. 1075 (1909).  The Copyright Act was overhauled in 1976 to eliminate

the historical distinction between published and unpublished works, making all

works "fixed in a tangible medium of expression" copyrightable under federal law

and preempting Section 543.02 as written.  17 U.S.C. §§ 102, 301(c).  As a result,

the Legislature repealed Section 543.02 in 1977.

Plaintiff contends that the effect of this repeal was to vest pre-1972

recording owners with absolute, "unconstrained" rights.  Br. at 16.  Plaintiff failed

to raise this argument below and thus "forfeited it on appeal."  *Smith v. Psychiatric

Solutions, Inc.*, 750 F.3d 1253, 1262 (11th Cir. 2014).  The argument is specious in

27

any event.  Florida law is clear that "[w]hen a statute is repealed, it is as if the repealed statute never existed."  *Bd. of Trustees of the Internal Improvement Trust Fund v. Key West Conch Harbor*, 683 So. 2d 144 (Fla. Dist. Ct. App. 1996) (Gersten, J., dissenting) (citing *Yaffee v. Int'l Co.*, 80 So. 2d 910, 912 (Fla. 1955)).  Plaintiff's own cases confirm this.  *See City of Miami v. Metro. Dade Cty.*, 407 So. 2d 243, 244-45 (Fla. Dist. Ct. App. 1981); *State of Fla. ex rel. Fussell v. McClendon*, 109 So. 2d 783, 785 (Fla. Dist. Ct. App. 1959).  The repeal of Section 543.02 did *not* create a broad new performance right that never before existed (let alone apply that new right retroactively to recordings that, like plaintiff's, were published before 1977).  The repeal had no effect, other than to preserve existing common law, which did not recognize *any* performance right.

The legislative history confirms that the Legislature *never* intended to grant pre-1972 recording owners unfettered, unlimited rights.  The sole purpose of repealing Section 543.02 was to avoid preemption by the 1976 Copyright Act.  *See* Fla. H. Comm. on Commerce, HB 1780 (1977), Staff Report at 1 (Apr. 27, 1977) ("1977 Report") (statute no longer necessary because "[o]wners of copyrights are now protected under the Federal copyright act").  Given this limited purpose, Section 543.02 was repealed with no debate.  40 Fla. Sen. Journal 856 (June 3, 1977) (noting that bill passed unanimously with no floor debate).  If the effect of this repeal was to grant pre-1972 recording owners an unlimited copyright, such a

radical change would have attracted widespread attention from stakeholders, many of whom would have asserted the same vigorous objections that were rampant in the heated debate over proposals to create a performance right in sound recordings in the 1976 Copyright Act just one year earlier. *Supra* at 14.

Importantly, the Legislature did *not* repeal Florida's anti-piracy statute, Section 540.11, noting that without it pre-1972 recording owners would "not be protected by *any* law, state or Federal." 1977 Report at 2 (emphasis added). There would have been no need to maintain Section 540.11 if the repeal of Section 543.02 had granted pre-1972 recording owners unlimited protection.[9]

Likewise, Florida's civil theft statute does not create any new property rights under Florida law. It simply provides that "[a] person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another" with the requisite criminal intent. FLA. STAT. § 812.014 (2011). While property is defined to include "anything of value," including rights in tangible or intangible property, this does not create property rights that do not otherwise exist. *Id.* § 812.014(b). To the contrary, Sections 812.012 and 812.014 require that a plaintiff establish a legally cognizable "interest in the property upon which another

---

[9] Florida's anti-piracy statute expressly exempts radio broadcasters—which further confirms that the Legislature only intended to grant recording owners limited protection. FLA. STAT. § 540.11(6)(a) (exempting "any broadcaster who, in connection with, or as part of, a radio ... broadcast transmission ... transfers any such sounds recorded on a sound recording.").

is not privileged to infringe without consent" before asserting a civil theft claim.

*Balcor Prop. Mgmt., Inc. v. Ahronovitz*, 634 So. 2d 277, 280 (Fla. Dist. Ct. App.

1994).[10]  All of plaintiff's cases involve the alleged theft of an established property

right.  Br. at 27-28.  Here, plaintiff has *no* property interest—tangible or

intangible—in performances of its pre-1972 recordings under Florida law.

### E.     Creating A Common Law Performance Right Is A Matter Of Legislative Policymaking.

After holding that Florida law does not grant plaintiff an unfettered,

unconditional right to control performances of its pre-1972 recordings, the district

court rightly declined to create such a right as an exercise of judicial will.  The role

of a federal court sitting in diversity is to interpret Florida law, not expand it to

invent a controversial new right.  FE Vol. 2, Doc. 142 at 9 ("While the Court

regularly interprets Florida law to resolve claims in diversity jurisdiction, it is not

the Court's place to expand Florida common law by creating new causes of action.

Federal courts are entrusted to apply state law, not make it.") (citing *Zombori v.*

*Digital Equip. Corp.*, 878 F. Supp. 207, 209-10 (N.D. Fla. 1995)).

---

[10] Florida courts have routinely dismissed civil theft claims where a plaintiff could not make this threshold showing.  *See id.* (plaintiff could not prove ownership of goods); *Sussex Mut. Ins. Co. v. Gabor*, 568 So. 2d 1004, 1005 (Fla. Dist. Ct. App. 1990) (plaintiff failed to allege property interest in "book of business"); *accord R.C. v. State*, 481 So. 2d 14, 15 (Fla. Dist. Ct. App. 1985) ("Ownership must be alleged and proved to support a conviction for theft.").

Balancing the interests and competing policy considerations necessary to create a performance right is a distinctively legislative function, and not one for which the judicial branch is well suited.  "[O]f the three branches of government, the judiciary is the least capable of receiving public input and resolving broad public policy questions based on a societal consensus." *Shands*, 497 So. 2d at 647.  Where, as here, the creation of a new right would dramatically expand existing law and affect competing stakeholders—including parties not before the Court, such as composers, performing artists, and consumers—the decision whether and how to establish this right should be left to a legislature, which "is entrusted with, and better equipped to handle, decisions concerning public policy matters." *Barr v. State*, 507 So. 2d 175, 176 (Fla. Dist. Ct. App. 1987); *see Krischer v. McIver*, 697 So. 2d 97, 104 (Fla. 1997) (common law must evolve incrementally to avoid arrogating powers "that as a constitutional matter belong only to the legislature"); *Horne*, 533 So. 2d at 262-63 (legislature, rather than courts, should address change in law "with broad implications which requires input from the various interests involved"); *Shands*, 497 So. 2d at 647 (declining to create common-law right because it is "wiser to leave it to the legislative branch").

There is no doubting the widespread policy, economic, and administrative consequences of the new right plaintiff seeks.  As the district court acknowledged: "to recognize and create this broad right in Florida, the music industry—including

31

performers, copyright owners, and broadcasters—would be faced with many

unanswered questions and difficult regulatory issues including: (1) who sets and

administers the licensing rates; (2) who owns a sound recording when the owner or

artist is dead or the record company is out of business; and (3) what, if any, are the

exceptions to the public performance right."  FE Vol. 2, Doc. 142 at 9.

Indeed, Congress grappled with exactly the same questions in considering

whether and how to create a statutory performance right, after almost a *century* of

debate on the issue.  When Congress enacted the DPRA in 1995, it was carefully

crafted to balance the competing policy interests—demonstrating exactly why the

creation of new rights concerning the performance of recordings lawfully obtained

must be a matter of legislative discretion rather than judicial will.  *See Sony*, 464

U.S. at 431 ("The judiciary's reluctance to expand the protections afforded by the

copyright without explicit legislative guidance is a recurring theme .…  Sound

policy, as well as history, supports our consistent deference to Congress … [which]

has the constitutional authority and the institutional ability to accommodate fully

the varied permutations of competing interests.").

The DPRA was enacted after dozens of witnesses testified about the various

policy considerations, committees produced multiple reports detailing their

findings, and Congress revised the proposed legislation to address each issue.  *See*

H.R. REP. NO. 104-274 (1995) (SXM Vol. 1, Doc. 81-17); S. REP. NO. 104-128

(1995) (SXM Vol. 2, Doc. 81-28).  On the one hand, Congress wanted to protect recording owners, who claimed that the advent of new digital technologies cut into their profits.  *See* S. REP. NO. 104-128, at 15 (SXM Vol. 2, Doc. 81-28 at 15); H.R. REP. NO. 104-274, at 13-14 (SXM Vol. 1, Doc. 81-17 at 15-16).  On the other hand, Congress sought to protect broadcasters and avoid "imposing new and unreasonable burdens on ... broadcasters, which often promote, and appear to pose no threat to, the distribution of sound recordings."  S. REP. NO. 104-128, at 15 (SXM Vol. 2, Doc. 81-28 at 16); *see* 141 CONG. REC. S945-02, at 948 (Jan. 13, 1995) (DPRA's sponsor rejecting unlimited performance right because "long-established business practices within the music and broadcasting industries represent a highly complex system … and should not be lightly upset").

Moreover, the DPRA includes an exemption for AM/FM radio and a complex compulsory licensing scheme, which ensures that digital and satellite broadcasters like Sirius XM can obtain a statutory license to perform a post-1972 recording at a reasonable royalty rate.  S. REP. NO. 104-128, at 15-16 (SXM Vol. 2, Doc. 81-28 at 16).  The DPRA also includes a requirement that the recording owner share one-half of the compulsory license fees with performing artists, instead of pocketing the money for itself.  H.R. REP. NO. 104-274, at 14-15, 24 (SXM Vol. 1, Doc. 81-17 at 15-16, 23).

There could be no judicial counterpart to this carefully reticulated legislative process.  As the district court noted, a legislative body "is in the best position to address these issues" and determine "whether copyright protection for pre-1972 recordings *should* include the exclusive right to public performance."  FE Vol. 2, Doc. 142 at 9 (emphasis added).

Plaintiff glosses over the obvious problems that would result from the invention of a common-law performance right, asserting that parties could simply negotiate a license, as in any other market transaction.  Br. at 31.  It is hardly so simple.  Plaintiff is asking the Court to create a new market that never before existed, with no rules, boundaries, or enforcement mechanisms.  How will a broadcaster identify the recording owner with whom a license must be negotiated?  Who will resolve ownership disputes?  What happens if the parties are unable to agree on a royalty rate?  Even if they are, how will royalties be distributed?  Must a recording owner share the royalties with the performing artists?  Only a legislature can address these and other policy questions and craft a regulatory scheme to address them.[11]

---

[11] A common-law performance right would "come into direct conflict" with the regulatory scheme Congress designed for post-1972 recordings in the DPRA. Ross, *supra*, at 13; *see* Gary Pulsinelli, *Happy Together?  The Uneasy Coexistence of Federal and State Protection for Sound Recordings*, 82 TENN. L.R. 167, 214 (2014) (same); *see* Br. for Law Professors Gary Pulsinelli *et al.* as Amici Curiae, *Sirius XM Radio Inc. v. Flo & Eddie, Inc.*, Appeal No. 15-1164 (2d Cir.) (Dkt. 58).

**II.    THE JUDGMENT BELOW CAN BE AFFIRMED ON THE ALTERNATIVE GROUND THAT APPLYING A COMMON LAW PERFORMANCE RIGHT TO SIRIUS XM WOULD VIOLATE THE COMMERCE CLAUSE.**

Even if Florida law did grant pre-1972 recording owners a performance right, applying such a right to Sirius XM—which is required by the FCC to have nationally uniform satellite broadcasts—would violate the Commerce Clause.  If the Court reverses the district court's performance-right ruling, it should nonetheless affirm the judgment below on this alternative ground.

**A.    The Federal Copyright Act Does Not Authorize Florida To Burden Interstate Commerce.**

The district court held that Sirius XM's Commerce Clause argument was moot, but suggested it would fail in any event because Section 301(c) of the Copyright Act immunizes state laws concerning pre-1972 recordings from Commerce Clause scrutiny.  FE Vol. 2, Doc. 142 at 11.  That was erroneous.

---

The Copyright Office recently issued a report criticizing the New York and California courts' rulings, noting the policy problems that would result from a state performance right, and advocating for federal regulation, which can offer "uniform protection … as well as appropriate exceptions and limitations."  U.S. COPYRIGHT OFFICE, COPYRIGHT AND THE MUSIC MARKETPLACE 53-55, 85-87 (2015), *available at* http://copyright.gov/policy/musiclicensingstudy/copyright-and-the-music-marketplace.pdf; *see* SXM Vol. 2, Doc. 81-29 at 12 (comments of SoundExchange, which administers royalties under the DPRA:  New York and California rulings "will not lead to a sensible regime for licensing" and "do not provide the simplicity and efficiency that Congress contemplated when enacting the statutory licenses" in the DPRA).

35

States cannot regulate interstate commerce unless Congress *expressly* authorizes them to do so in a way that is "unambiguous" and "unmistakably clear." *Wyoming v. Oklahoma*, 502 U.S. 437, 458, 112 S. Ct. 789 (1992); *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91, 104 S. Ct. 2237 (1984). Section 301(c) provides that "[w]ith respect to [pre-1972 recordings], any rights or remedies under the common law or statutes of any State shall not be annulled or limited *by this title*." 17 U.S.C. § 301(c) (emphasis added). This is a classic example of a "savings clause," which saves state laws concerning pre-1972 recordings from express preemption by the Copyright Act (*i.e.*, "this title"). *See Sporhase v. Nebraska*, 458 U.S. 941, 960, 102 S. Ct. 3456 (1982) (statute providing "nothing *in this Act* shall be construed as affecting … the laws of any State" was savings clause") (emphasis added); *accord New Eng. Power Co. v. New Hampshire*, 455 U.S. 331, 341, 102 S. Ct. 1096 (1982). But, as the New York court recognized, Section 301(c) says nothing about the *Commerce Clause*, and certainly does not "'unambiguous[ly],' or 'unmistakab[ly],' permit state interference with interstate commerce." 62 F. Supp. 3d at 351;[12] *see* Pulsinelli, *supra*, at 228-33 (surveying cases and concluding Section 301(c) "lacks the requisite specificity" to constitute Congressional authorization to burden interstate commerce).

_____

[12] The New York court ultimately concluded that New York common law is not a "regulation" subject to Commerce Clause scrutiny, which is incorrect—state common law is just as much a "regulation" as any other form of state law. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 n.17, 116 S. Ct. 1589 (1996).

The sole case cited by the district court, *White v. Massachusetts Council of Const. Emp'rs, Inc.*, 460 U.S. 204, 103 S. Ct. 1042 (1983), is not to the contrary. *White* involved an executive order by Boston's mayor requiring that construction projects "be performed by a work force consisting of at least half *bona fide* residents of Boston." *Id.* at 206. The court held that this order did not violate the Commerce Clause because federal regulations providing that construction work should be given to local residents "affirmatively permit[ted] [such] parochial favoritism." *Id.* at 213 & n.11. In this case, Section 301(c) does *not* "affirmatively permit" states to regulate pre-1972 recordings in a way that interferes with interstate commerce.

### B.    Applying A Florida Performance Right To Sirius XM's National Broadcasts Would Violate The Commerce Clause.

There are two separate, independent tests for whether application of a state law violates the Commerce Clause: a *per se* test and a balancing test. Applying a Florida performance right to Sirius XM would satisfy both tests.

An otherwise valid state law can *per se* violate the Commerce Clause when *applied* in a way that affects interstate commerce. The law's intent is irrelevant. The "critical" question is whether, as applied, the law has the "practical effect" of "control[ling] conduct beyond the boundaries of the State." *NCAA v. Miller*, 10 F.3d 633, 639 (9th Cir. 1993); *see Healy v. Beer Inst., Inc.*, 491 U.S. 324, 332, 109 S. Ct. 249 (1989) ("[A] state law that has the 'practical effect' of regulating

37

commerce occurring wholly outside the State's borders is invalid."); *Island Silver & Spice, Inc. v. Islamorada*, 542 F.3d 844, 846-47 (11th Cir. 2008) ("practical effect" of even-handed law can subject it to "elevated [*per se*] scrutiny").

Courts have held that a state law has the practical effect of regulating interstate commerce when it is applied to an entity engaged in conduct that has no geographic boundaries or is nationally uniform. *See Am. Booksellers Found. v. Dean*, 342 F.3d 96, 103-04 (2d Cir. 2003) (*per se* violation to apply Vermont statute to certain types of "boundary-less … internet speech" because its practical effect was regulating conduct outside of Vermont); *NCAA*, 10 F.3d at 639 (*per se* violation to apply Nevada statute imposing due process requirements to the NCAA, which adheres to nationally uniform rules, because that would effectively require the NCAA to comply with Nevada law nationwide); *Flood v. Kuhn*, 407 U.S. 258, 284-85, 92 S. Ct. 2099 (1972) (violation of Commerce Clause to apply state's antitrust statute to national baseball league following uniform rules).

Sirius XM's broadcasts have no geographic boundaries *and* are required by federal law to be nationally uniform. Sirius XM broadcasts to millions of people across the country through satellite radio and internet streaming—which are by nature "boundary-less"—and the car radios, mobile devices, and computers that subscribers use to access those broadcasts (most often while driving) are routinely transported across state lines. SXM Vol. 1, Doc. 78 ¶¶ 4-6; Doc. 79 ¶¶ 4-6, 11;

Doc. 80 ¶ 3.  Because Sirius XM's satellite radio transmissions are one-way, it

cannot control or track where they are received.  SXM Vol. 1, Doc. 79 ¶ 11 n.2;

Doc. 78 ¶ 6.

Moreover, the FCC requires Sirius XM's broadcasts to be nationally

uniform.  FCC regulations require that satellite radio broadcasts be "restricted to

the simultaneous retransmission of the complete programming" and "may not be

used to distribute any information not also transmitted to all subscribers'

receivers."  47 C.F.R. § 25.144(e)(4) (2015); *see id.* § 25.144(a)(3)(i); SXM Vol. 1,

Doc. 78 ¶ 7; Doc. 79 ¶ 11.  Moreover, Sirius XM's FCC license "prohibits" it from

using terrestrial repeaters, which facilitate satellite broadcasts, to "distribute

localized content that is distinct from that provided to subscribers nationwide via

satellite."  23 FCC Rcd. 12348 ¶ 155 (2008); SXM Vol. 1, Doc. 79 ¶ 11.

Florida's regulation of Sirius XM's performance of pre-1972 recordings

would also violate the balancing test.  When a state law "regulates even-handedly

to effectuate a legitimate local public interest, and its effects on interstate

commerce are only incidental, it will be upheld unless the burden imposed on such

commerce is clearly excessive in relation to the putative local benefits."  *Pike v.

Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844 (1970).

*First*, there is no Florida-specific interest at stake.  This is not a case in

which Florida has a unique interest in ensuring the "safety, health and well-being

39

of local communities, … which, because of its local character and the practical difficulties involved, may never be adequately dealt with by Congress." *Parker v. Brown*, 317 U.S. 341, 362-63, 63 S. Ct. 307 (1943). To the contrary, Congress already regulates rights in *post*-1972 recordings—and is far better situated than Florida to regulate rights in *pre*-1972 recordings. A performance right does not just protect Florida recording owners—it applies to recording owners worldwide. And this right does not just restrict Florida broadcasters—it applies to every entity performing a pre-1972 recording received by any user located in Florida. Plaintiff has yet to identify *any* Florida-specific interest. *Cf. Pike*, 397 U.S. at 143 (recognizing Arizona's interest in protecting reputation of local fruit growers).

*Second*, even if some local benefit would accrue to Florida, the burden on interstate commerce is not "incidental" and far outweighs any interest Florida might have. It would require all broadcasters whose performances of pre-1972 recordings are received in Florida to identify, locate, and attempt to negotiate with the owners of those recordings for a reasonable license agreement—without the benefit of a registration system or compulsory licensing scheme. *See* SXM Vol. 1, Doc. 78 ¶¶ 33-44. The demands imposed on broadcasters—not just digital, but traditional AM/FM broadcasters as well—would have "significant economic consequences" and "could upend the analog and digital broadcasting industries." *Flo & Eddie*, 62 F. Supp. 3d at 352; *see* FE Vol. 2, Doc. 142 at 9. Many

40

broadcasters would be forced to shut down or stop performing pre-1972 recordings, depriving listeners nationwide of access to music.  SXM Vol. 1, Doc. 78 ¶ 7; Doc. 79 ¶ 11; *cf. Pike*, 397 U.S. at 145 (requiring fruit company to build $200,000 packaging plant in Arizona unreasonably burdened interstate commerce).

*Third*, courts applying the balancing test have held that entities adhering to nationally uniform rules, like Sirius XM, are unreasonably burdened by application of state laws regulating the same subject matter.  *See Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 168 (S.D.N.Y. 1997) ("The unique nature of the Internet highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even outright inconsistent regulation by states …."); *ACLU v. Johnson*, 194 F.3d 1149, 1162 (10th Cir. 1999) ("The Internet, like ... rail and highway traffic ..., requires a cohesive national scheme of regulation so that users are reasonably able to determine their obligations.").  Sirius XM adheres to nationally uniform rules, and is prohibited by the FCC from tailoring its satellite broadcasts to Florida or any other state.  SXM Vol. 1, Doc. 78 ¶ 7; Doc. 79 ¶ 11. Moreover, it is not possible to tailor broadcasts by state using Sirius XM's current satellite technology, SXM Vol. 1, Doc. 79 ¶ 11; Doc. 78 ¶ 7, and designing and implementing new technology would require new satellites and millions of new receivers.  The burden of requiring Sirius XM to change its national broadcasts to comply with Florida law far outweighs any benefit to Florida.

### III. THE DISTRICT COURT RIGHTLY HELD THAT PLAINTIFF'S UNFAIR COMPETITION, CONVERSION, AND CIVIL THEFT CLAIMS ARE MERITLESS.

Because Florida law does not grant plaintiff a right to control performances of its pre-1972 recordings—and application of such a right to Sirius XM would violate the Commerce Clause in any event—the district court correctly concluded that plaintiff's unfair competition, conversion, and civil theft claims fail as a matter of law.  FE Vol. 2, Doc. 142 at 11.

### A. The Non-Copyright Doctrines Plaintiff Invokes Do Not Provide Greater Protection Than Copyright.

In order to prevail on any of these claims, plaintiff must show some unlawful act or taking of property.  *See M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1493 (11th Cir. 1990) (unfair competition requires "deceptive or fraudulent conduct of a competitor"); *Star Fruit Co. v. Eagle Lake Growers*, 33 So. 2d 858, 860 (Fla. 1948) (conversion requires "wrongful deprivation of property"); FLA. STAT. § 812.014 (civil theft requires wrongful taking of "property").  Plaintiff cannot meet this threshold requirement, because it has no protectable right or property interest in performances of its pre-1972 recordings.

Plaintiff argues that Florida's unfair competition, conversion, and civil theft law provides greater protection for intangible property interests than common-law copyright, relying on *Garrod* and two out-of-state cases, *Naxos* and *Lone Ranger*. Plaintiff misstates the law.

42

*Garrod* held only that a pre-1972 recording owner can prevent unauthorized copying and distribution by bootleggers through claims for unfair competition, conversion, and civil theft.  This approach is wholly consistent with—and certainly no broader than—protections afforded by common-law copyright and federal copyright law.  622 F. Supp. at 534-36; *supra* at 23-24.

*Lone Ranger* took the same approach.  At the time it was decided, California had a statute that, like the now-repealed Section 543.02, provided that common-law copyright expired upon publication of a work.  Because the recordings in *Lone Ranger* had been published and thus lost all common-law copyright protection, the court concluded that unfair competition and conversion doctrines could protect a recording owner from record piracy.  *Lone Ranger TV, Inc., v. Program Radio Corp.*, 740 F.2d 718, 725-26 (9th Cir. 1984).  *Lone Ranger*, like *Garrod*, did not substantively expand the scope of rights in pre-1972 recordings.  The Supreme Court has rejected similar efforts to construe non-copyright doctrines as providing greater protection than federal copyright law.  *See Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 33-36, 123 S. Ct. 2041 (2003) (holding that Lanham Act does not prevent unaccredited copying of an uncopyrighted work).

*Naxos* held that to prevail on an unfair competition claim based on unauthorized duplication of a copyrighted work, a plaintiff must establish "competition in the marketplace" *in addition to* unauthorized copying.  4 N.Y.3d at

43

563.  In other words, an unfair competition claim provides *less* protection to

copyright owners, because it requires them to establish an extra element.

Even if plaintiff could show that it had some protectable, non-copyright

interest in performance of its pre-1972 recordings, its unfair competition,

conversion, and civil theft claims would nonetheless fail.

### B.    Plaintiff's Unfair Competition Claim Is Meritless.

Florida unfair competition law requires a plaintiff to establish:  (1) deceptive

or fraudulent conduct, (2) competition, and (3) likelihood of consumer confusion.

*See M.G.B. Homes*, 903 F.2d at 1493; *Magical Mile, Inc. v. Benowitz*, 510 F. Supp.

2d 1085, 1089-90 (S.D. Fla. 2007).  Plaintiff cannot satisfy any requirement.

As to the first and third elements, plaintiff alleged that Sirius XM's

"unauthorized use of the Pre-1972 Recordings is likely to cause confusion, mistake

or deception as to the source, sponsorship, affiliation or connection" between

plaintiff and Sirius XM.  FE Vol. 1, Doc. 36 ¶ 48.  The undisputed evidence below

confirms that there was *no* deception or confusion.  Sirius XM has openly

performed pre-1972 recordings for years (along with every other terrestrial and

digital broadcaster), and never hid that fact.  *See* SXM Vol. 1, Doc. 78 ¶ 10; Doc.

79 ¶ 12.  Plaintiff has admitted that it "is not presently aware of any actual

[consumer] confusion."  SXM Vol. 1, Doc. 78 ¶ 47; Doc. 81-7 at 4-5.  Howard

Kaylan, one of plaintiff's two principals, testified:  "I never thought that [Sirius]

was being sponsored by anybody, let alone artists." SXM Vol. 1, Doc. 78 ¶ 48; Doc. 81-2 at 106:4-18.

As to the second element, unfair competition "refers unambiguously only to actions affecting competitors." *Practice Mgmt. Assocs., Inc. v. Old Dominion Ins. Co.*, 601 So. 2d 587, 587-88 (Fla. Dist. Ct. App. 1992). This requires some "element of rivalry" between plaintiff and defendant. *Id.* Plaintiff argues that Sirius XM is a competitor because it sells to subscribers performances of pre-1972 recordings that plaintiff could otherwise license itself. Br. at 38-39.

This assumes (incorrectly) that plaintiff has a right to license performances at all. This is also contradicted by the undisputed record evidence. Plaintiff has *never* licensed its pre-1972 recordings to broadcasters, webcasters, or any other entity that performs music for the public (*e.g.*, bars or retail stores). SXM Vol. 1, Doc. 78 ¶¶ 34-35, 39-40, 42-43; Doc. 81-4 at 6-14. Plaintiff has only licensed its pre-1972 recordings for download via iTunes-type services or use in films, television, or commercials. FE Vol. 1, Doc. 94 at 3. As plaintiff has admitted, Sirius XM's broadcasts have no effect on these licensing efforts—plaintiff's principals were unable to identify a *single* lost license attributable to Sirius XM, and admitted there is no "evidence that Sirius XM has impaired Flo & Eddie's ability to license its pre-72 recordings." SXM Vol. 1, Doc. 78 ¶ 45; Doc. 81-1 at 95:23-25, 97:5-12; Doc. 81-2 at 107:13-108:5. Not surprisingly, plaintiff's

45

principals testified that they do not consider Sirius XM to be a competitor.  SXM

Vol. 1, Doc. 78 ¶ 46; Doc. 81-2 at 93:18-94:4 ("I don't know how we would be

considered a competitor with a satellite provider. We don't do that.").[13]

     Plaintiff resorts to arguing that Florida's unfair competition law is "elastic[]

and flexib[le]," and that *Garrod* sets forth a more lenient test requiring only:

(1) time, labor, and money expended by plaintiff, (2) competition, and

(3) commercial damage.  Br. at 37.  The *Garrod* test, however, was expressly

limited to "cases involving record piracy."  *Ediciones Musicales y*

*Representaciones Internacionales, S.A. v. San Martin*, 582 F. Supp. 2d 1358, 1361

(S.D. Fla. 2008); *see Workplace Corp. v. Office Depot, Inc.*, 1990 WL 106727, at

*1 n.2 (M.D. Fla. June 5, 1990) ("As specifically stated in *CBS*, [the court's] list of

requisite elements extends only to *cases involving record piracy*.").  This is not a

record piracy case.  A bootlegger's illicit copying and sale of a recording is not

comparable to a broadcaster's performance of a lawfully obtained recording on the

radio (as radio stations have done for nearly a century).  *Supra* at 24.  Recording

owners have themselves drawn this distinction, observing that while "the

duplication of a phonograph record and the selling of that record is an act of unfair

---

[13] Plaintiff cites out-of-circuit cases to argue that one competes merely by "monetizing" another's content.  Br. at 39.  Plaintiff misreads those cases.  For example, in *Arista Records LLC v. Lime Grp. LLC*—a record piracy case—the court found competition because defendant's "[f]ree distribution of the Recordings through LimeWire" *directly* competed with, and served as a market substitute for, "Plaintiffs' sales of the Recordings." 784 F. Supp. 2d 398, 437 (S.D.N.Y. 2011).

competition …, it would be going a long way for any court to say … that the playing of a record over the air, the mere use of a record in that manner, is an act of unfair competition." *Revision of Copyright Laws: Hearings Before the H. Comm. on Patents*, 74th Cong. 639 (Comm. Print 1936) (representative of Brunswick Record Corp. and Columbia Phonograph Co.).

Plaintiff could not satisfy the *Garrod* test even if it were applicable.  As discussed above, plaintiff is not in competition with Sirius XM, and could not identify any commercial damage attributable to Sirius XM.  Plaintiff says that it need only point to revenue Sirius XM earned from broadcasting pre-1972 recordings to show "commercial damage," Br. at 39, but plaintiff's own case confirms this is not sufficient—a plaintiff must show "that it would have earned a profit (of any amount) but for [defendant's] conduct."  *AlphaMed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1352-55 (S.D. Fla. 2006); *see Playboy Enters., Inc. v. Webbworld, Inc.*, 991 F. Supp. 543, 558 (N.D. Tex. 1997) (claim "fail[ed] conclusively" where plaintiff did not show any drop in sales or evidence of diminution of value of copyrights).

Likewise, plaintiff's argument that Sirius XM purportedly is "endeavoring to reap where it has not sown," Br. at 38 (quoting *Int'l News Serv. v. Assoc. Press*, 248 U.S. 215, 239, 39 S. Ct. 68 (1918) ("*INS*")), is insufficient.  As plaintiff admits, *INS* is no longer good law, and courts have repeatedly cautioned against so

47

loose a conception of property rights.  *See WCVB-TV v. Boston Athletic Ass'n*, 926

F.2d 42, 45 (1st Cir. 1991) (law does not always "protect[] investors from the 'free

riding' of others"); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 117 F. Supp. 2d

1322, 1328-29 (M.D. Fla. 2000) ("[F]ree riding only becomes detrimental to

competition when 'the ability of other parties to free-ride ... would so reduce the

incentive to produce the product or service that its existence or quality would be

substantially threatened.").

### C.    Plaintiff's Conversion Claim Is Meritless.

It is well settled that a conversion claim under Florida law requires a

"*wrongful deprivation* of a person of property to the possession of which he is

entitled."  *Star Fruit*, 33 So. 2d at 860 (emphasis added); *see Small Bus. Admin. v.

Echevarria*, 864 F. Supp. 1254, 1262-64 (S.D. Fla. 1994) (conversion requires

intentional and "unauthorized act which deprives another of his property").  In

other words, it is not enough that Sirius XM used plaintiff's pre-1972 recordings

and benefitted from that use.  Plaintiff must establish that:  (1) Sirius XM deprived

it of some possessory right, and that deprivation was (2) wrongful and

(3) intentional.  *Id.*  Plaintiff has failed to satisfy that burden.

Even assuming that plaintiff has a protectable property interest in

performances of its pre-1972 recordings, there has been no deprivation.  Sirius XM

merely performed its own lawfully obtained copies of plaintiff's recordings.

48

Plaintiff was free to make or license its own performances of those recordings. There is no evidence that Sirius XM's performances deprived plaintiff of any business opportunity—to the contrary, plaintiff could not identify a single lost license or sale.  SXM Vol. 1, Doc. 78 ¶ 45; Doc. 81-1 at 95:23-25, 97:5-12; Doc. 81-2 at 107:13-108:5.  For this reason, courts have dismissed conversion claims grounded in the unauthorized use of a plaintiff's copyrighted work, as this "fails to deprive the plaintiff of his property." *Santilli v. Cardone*, 2008 WL 2790242, at *5 (M.D. Fla. July 18, 2008); *accord Glades Pharm., LLC. v. Murphy*, 2005 WL 3455857, at *8 (N.D. Ga. Dec. 16, 2005); *cf. Warshall v. Price*, 629 So. 2d 903, 904-05 (Fla. Dist. Ct. App. 1993) (permitting conversion claim where competitor stole a copy of plaintiff's confidential patient list and used it to solicit business, thus depriving plaintiff of benefit of his property).

Plaintiff cites no case to the contrary.  In *Intelsat Corp. v. Multivision TV LLC*, 2010 WL 5437261, at *1-2 (S.D. Fla. Dec. 27, 2010), plaintiff agreed to provide defendant with satellite communication services in exchange for fees. When defendant failed to pay, plaintiff tried to jam defendant's transmission.  In retaliation, defendant interfered with the transmissions of plaintiff's customers and forced plaintiff to move its customers to other satellite devices.  The court found defendant liable for conversion because its actions "prevented [the plaintiff] from using the satellite transponder *for any purpose*." *Id.* at *5 (emphasis added).  Here,

in contrast, Sirius XM's performance of plaintiffs' recordings did not prevent

plaintiff from making or licensing its own performances.

In *Joe Hand Promotions v. Hart*, 2012 WL 1289731 (S.D. Fla. Apr. 16,

2012), plaintiff obtained a license to distribute a UFC fight via closed circuit TV

and satellite, and sublicensed the fight to others.  Defendant intercepted plaintiff's

signal to make his own, competing broadcast.  On a motion to dismiss, the court

held that this unauthorized use *could* constitute "the wrongful taking of intangible

business interests" sufficient to state a conversion claim.  *Id.* at *2.  Again, this is

not a situation where Sirius XM deprived plaintiff of any business opportunity—

plaintiff itself acknowledged that Sirius XM's broadcasts have no impact on its

licensing efforts.  SXM Vol. 1, Doc. 81-1 at 97:9-12.

Nor can plaintiff establish that Sirius XM's performances were wrongful or

made with wrongful intent.  In *Intelsat* and *Joe Hand*, the defendant intended to

take and use the plaintiff's property in a way that violated the law.  Here, Sirius

XM merely broadcast its lawfully obtained copies of plaintiff's recordings, as

AM/FM broadcasters, club DJs, restaurants, retail stores, and thousands of others

have done for decades based on the unanimous consensus that pre-1972 recording

owners have no right to demand licenses for such performances.  Indeed, plaintiff

has openly encouraged Sirius XM to perform its recordings and reaped the

promotional benefits of airplay, without once asking Sirius XM to stop or pay

50

royalties.  SXM Vol. 1, Doc. 81-4 at 3-5.  There is *no* case finding a wrongful or intentional taking in comparable circumstances.

### D.    Plaintiff's Civil Theft Claim Is Meritless.

Under Florida law, civil theft is simply conversion plus criminal intent.  FLA. STAT. §§ 812.014; 772.11; *see Gersh v. Cofman*, 769 So. 2d 407, 409 (Fla. Dist. Ct. App. 2000).  Plaintiff's civil theft claim thus fails for the same reasons as its conversion claim.  Nor can plaintiff establish criminal intent, which requires clear and convincing evidence of a "guilty mind" and "actual knowledge" of theft.  *City of Cars, Inc. v. Simms*, 526 So. 2d 119, 120 (Fla. Dist. Ct. App. 1988); *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1327 (11th Cir. 2006); *Echevarria*, 864 F. Supp. at 1264-65.

There is no evidence whatsoever that Sirius XM intended to commit any theft.  As set forth above, Florida law has never granted pre-1972 recording owners a right to control performances of their recordings, and Sirius XM has openly broadcast recordings for years based on this understanding.  No criminal intent can exist in such circumstances.  *See Tedder v. Florida*, 75 So. 783, 783 (Fla. 1917) (where a "taking is open, and there is no subsequent attempt to conceal the property, and no denial, but an avowal of the taking, a strong presumption arises that there was no felonious intent"); *Siplin v. State*, 972 So. 2d 982, 987 (Fla. Dist. Ct. App. 2007) ("[W]here it clearly appears that the taking was perfectly consistent

with honest conduct, although the party charged with the crime may have been

mistaken, he cannot be convicted of larceny.").

## IV.  THE DISTRICT COURT RIGHTLY HELD THAT INTERNAL, PARTIAL REPRODUCTIONS MADE TO FACILITATE SIRIUS XM'S PERFORMANCES ARE LAWFUL.

Plaintiff's claims below also challenged incidental reproductions made to

facilitate Sirius XM's broadcast of pre-1972 recordings.  As the district court held,

these reproductions—which are temporary, fragmentary, and *never* accessible to

the public—are lawful.

Gone are the days when a broadcaster can simply queue up a physical record

and broadcast it live.  SXM Vol. 1, Doc. 78 ¶ 11; Doc. 79 ¶ 17.  Sirius XM (like

other broadcasters) creates temporary copies, retained briefly in what are called

"buffers" or "caches" before being discarded, that ensure the uninterrupted

delivery of its content.  SXM Vol. 1, Doc. 79 ¶¶ 17, 30, 32, 33; Vol. 2, Doc. 101-2

¶¶ 3, 5.  These temporary buffer and cache copies, many of which are just a few

milliseconds long, are encrypted and inaccessible to the public.  *Id.*  It is

undisputed that these are the *only* copies of plaintiff's recordings Sirius XM makes

in Florida.[14]  Br. at 10.

---

[14] Although Sirius XM maintains a digital library of recordings on its servers in New York and Washington, D.C. that it uses to facilitate broadcasts—which are also inaccessible to the public—those copies are not at issue here because Florida law does not govern copies made in other states.  *Goldstein v. California*, 412 U.S. 546, 558, 93 S. Ct. 2303 (1973) ("[A] copyright granted by a particular State has

The court correctly held that these temporary copies do not constitute infringement.  In order to be an actionable "copy," a work "must be embodied in a medium ... for a period of more than transitory duration."  *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 127 (2d Cir. 2008) (buffer copies are non-infringing); *cf. Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98-99 (2d Cir. 2014) (even complete, permanent internal copies may constitute fair use if "reasonably necessary to facilitate [defendant's] services").  Sirius XM's buffer and cache copies—many of which exist for mere milliseconds—do not qualify.  None of plaintiff's cases involves buffer, cache, or similar copies.  *See Garrod*, 622 F. Supp. at 533 (defendant copied complete "master recordings"); *Stenograph LLC v. Bossard Assocs.,* 144 F.3d 96, 99 (D.C. Cir. 1998) (defendant copied complete software program onto computer); *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993) (same).

Plaintiff's only response is that the court cited *Cartoon Network* and *Authors Guild*, which were based on federal law, in reaching its decision.  But it is routine for courts interpreting common-law copyright to look to federal copyright law for guidance.  *Supra* at 22-23.  Indeed, the *Flo & Eddie* New York court cited *Cartoon Network* in noting that buffer and cache copies made by Sirius XM in New York were not infringing.  62 F. Supp. 3d at 344.

---

effect only within its boundaries … [and] citizens [of other states] remain free to copy within their borders those works which may be protected elsewhere.").

In addition, as the district court recognized, Sirius XM's buffer and cache copies constitute fair use.[15] Fair use is "a privilege in others … to use the copyrighted material in a reasonable manner without [the owner's] consent." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 549, 105 S. Ct. 2218 (1985). It is well-settled that the federal fair use factors apply to common law copyright infringement claims. *See* PATRY ON FAIR USE, *supra*, § 2:3 (fair use applies to common-law claims); *EMI*, 2008 WL 5027245 ("fair use exists at common law"); *Kramer*, 2006 WL 4729242, at *12 (same). In fact, the Supreme Court has made clear that the fair use defense is mandated by the First Amendment—meaning that it applies in state *and* federal courts. *Golan v. Holder*, 132 S. Ct. 873, 876 (2012) (fair use doctrine "serve[s] as built-in First Amendment accommodation"); *see* Neil Weinstock Netanel, *First Amendment Constraints on Copyright After* Golan v. Holder, 60 UCLA L. REV. 1082, 1086 (2013) ("[N]either Congress nor the courts may eviscerate copyright law's … fair use privilege without running afoul of the First Amendment.").

---

[15] Sirius XM did not "abandon" its fair use defense below. Sirius XM explained in its summary judgment motion that its buffer and cache copies are lawful because it does not allow "subscribers to save and access" those copies, FE Vol. 1, Doc. 77 at 20, and clarified in its reply that such copies are not actionable and constitute fair use, FE Vol. 2, Doc. 101 at 9-10. In any event, the district court had discretion to consider arguments first raised on reply. *See Spencer v. City of W. Palm Beach*, 2015 WL 4651089 at *6 n.6 (S.D. Fla. Aug. 5, 2015).

Of the fair use factors, the most important is "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4); *see Harper & Row*, 471 U.S. at 566 (market harm is "undoubtedly the single most important element of fair use").  This factor centers on whether the challenged use "usurp[s]" the market of the original work.  *SunTrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1281 (11th Cir. 2001) (Marcus, J., concurring).

Sirius XM's buffer and cache copies—which cannot be downloaded, streamed, or accessed by the public—have *no* effect on the market for plaintiff's recordings, much less a usurping effect.  If the court's performance-right ruling is reversed, it would create a new market for public performances of plaintiff's pre-1972 recordings, allowing plaintiff to license those recordings to broadcasters and others wishing to perform them.  Sirius XM's buffer and cache copies would not impact that market; plaintiff could still license its recordings in the same way and for the same price.  Plaintiff's principals have testified that they can identify no market harm from Sirius XM's broadcast of their recordings, SXM Vol. 1, Doc. 78 ¶ 45; Doc. 81-1 at 95:23-25, 97:5-12; Doc. 81-2 at 107:13-108:5—let alone temporary, seconds-long copies made to facilitate those broadcasts.  Sirius XM's buffer and cache copies thus constitute fair use as a matter of law.

## CONCLUSION

For the foregoing reasons, the judgment below should be affirmed.


Dated:            October 5, 2015            O'MELVENY & MYERS LLP

By: /s/ Daniel M. Petrocelli
    Daniel M. Petrocelli
    Cassandra L. Seto
    Evan T. Mayor
    1999 Avenue of the Stars, 7th Floor
    Los Angeles, CA 90067-6035
    Telephone: (310) 553-6700

    Jonathan D. Hacker
    1625 Eye Street, N.W.
    Washington, D.C. 20006
    Telephone: (202) 383-5300

    *Attorneys for Defendant-Appellee Sirius XM Radio Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because it contains 13,921 words, excluding the portions of the brief

exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the

typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements

of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced

typeface using Microsoft Word in 14-point Times New Roman.


Dated:        October 5, 2015        O'MELVENY & MYERS LLP

By:  /s/ Daniel M. Petrocelli
   Daniel M. Petrocelli
   Cassandra L. Seto
   Evan T. Mayor
   1999 Avenue of the Stars, 7th Floor
   Los Angeles, CA 90067-6035
   Telephone:  (310) 553-6700

   Jonathan D. Hacker
   1625 Eye Street, N.W.
   Washington, D.C. 20006
   Telephone:  (202) 383-5300

   *Attorneys for Defendant-Appellee Sirius XM
   Radio Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Daniel M. Petrocelli, a member of the Bar of this Court, certify that on October 5, 2015, I caused a true and correct copy of Brief Of Defendant-Appellee Sirius XM Radio Inc. and Supplemental Appendix of Defendant-Appellee Sirius XM Radio Inc. to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit.

I further certify that on October 5, 2015, I caused the requisite number of copies of Brief Of Defendant-Appellee Sirius XM Radio Inc. and Supplemental Appendix of Defendant-Appellee Sirius XM Radio Inc. to be mailed via Federal Express to the Court and to counsel of record for plaintiff-appellant Flo & Eddie, Inc. at the following addresses:

Gradstein & Marzano, P.C.
Henry D. Gradstein
Maryann R. Marzano
Harvey W. Geller
6310 San Vicente Blvd., Ste. 510
Los Angeles, CA 90048

Heller Waldman, P.L.
Glen H. Waldman
Jason T. Gordon
Eleanor T. Barnett
3250 Mary Street, Suite 102
Coconut Grove, Florida 33133

Dated:        October 5, 2015            /s/ Daniel M. Petrocelli
                                          Daniel M. Petrocelli